**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| DENNIS MILLER, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | No. 10-3469 |
| | : | |
| JEFFREY BEARD, Commissioner, Pennsylvania | : | |
| Department of Corrections, et al., | : | |
| Respondents. | : | |

_____ :

**Goldberg, J.**                                                                    **October 5, 2016**

<u>**MEMORANDUM OPINION**</u>

On October 1, 1997, following a bench trial in the Chester County Court of Common Pleas, Dennis Miller (hereinafter "Petitioner") was convicted of raping and murdering his wife, and was subsequently sentenced to death.  The Pennsylvania Supreme Court affirmed the conviction and sentence on direct appeal, and also affirmed the denial of Petitioner's claims for post-conviction collateral relief.  Petitioner has now filed a federal petition for a writ of habeas corpus under 28 U.S.C. § 2254, seeking relief from his convictions and death sentence.  He raises nine claims for relief, challenging the constitutionality of both his trial and sentencing hearing.  For the reasons set forth below, I will deny the habeas petition as to the first degree murder conviction, but will grant habeas relief on the rape conviction and death sentence.

**I.     FACTUAL AND PROCEDURAL HISTORY**

In its direct appeal opinion, the Pennsylvania Supreme Court set out the facts underlying Petitioner's conviction as follows:

> Miller resided with his wife, Sherry, and their two children, Barbara and Dennis, who at the time were twelve and four, at 301 Church Alley, Londongrove Township, Chester County.  Miller's marital relationship was, however, strained as a consequence of drug use, as well as jealousy and physical abuse directed toward his wife.  Notably, in July of 1994, Miller pled guilty to harassment and

1

disorderly conduct arising from an altercation with Sherry, and, in April of 1995, he pled guilty to aggravated assault in connection with an incident in which he held a gun to Sherry's head.  As a result of the later conviction, Miller was imprisoned for a term of nine to twenty-three months.

While in prison, Miller professed a desire to kill Sherry, and on the day of his release in September 1995, he told his cellmate, "I'll be back for killing my wife." Following his release from prison, Miller resumed living with his wife and children.

On November 18, 1995, Miller made arrangements with his mother, Agnes Miller, to supervise his children while he and Sherry visited a local tavern, Trib's Waystation.  At the bar, Miller and his wife drank beer and, at one point, ingested methamphetamine.  Although Miller did not appear to be intoxicated, during the course of the evening he became angry whenever his wife either spoke to another man or used the telephone.  [FN1: Sherry used the telephone at the bar to page Sean Smith, a man she dated during Miller's incarceration. Smith then telephoned Sherry in response to the page.]  At approximately 12:30 a.m. Miller and his wife left the bar.

On Sunday, November 19, Agnes Miller was surprised when Miller and his wife did not arrive during the breakfast hour as planned to retrieve their children.  As the day progressed, she became increasingly concerned.  Miller's daughter, Barbara, repeatedly telephoned the family residence, but no one answered.  In addition, Agnes Miller drove to Miller's home on two or more occasions.  On each occasion, she observed that the house was locked, no one answered the door, and Sherry's vehicle was missing.  Initially, Agnes Miller was concerned because Barbara was asthmatic and the medicine was located in Miller's home. Indeed, later that day, Barbara was taken to the hospital for treatment of an asthmatic attack.  Ultimately, on Monday, November 20, Agnes Miller contacted Sherry's mother, Mary Folk, to determine whether she had heard from her daughter.  As Ms. Folk had not, she filed a missing persons report with the Pennsylvania State Police.

In response to the report, the investigating trooper contacted the employers for Miller and his wife, checked with local prisons and hospitals, and interviewed family members.  Both Agnes Miller and Ms. Folk related to the police that Miller and his wife had used illicit drugs and speculated that they might have traveled to Philadelphia to purchase drugs.  The police also went to the Miller home, knocked on the door, and after receiving no response, checked the doors, finding them locked.  When these efforts failed, the troopers asked Agnes Miller to meet them at the residence.  Once there, Agnes Miller again expressed concern that something may have happened to her son and daughter-in-law because of their history of drug abuse.  The troopers who met Agnes Miller were familiar with Miller's drug problem and were aware of Miller's history of spousal abuse.  At Agnes Miller's request, and after receiving assurance from her that she would be

2

responsible for the property, the troopers agreed to forcibly enter the residence.

The troopers gained access through a basement window, checked the basement area, climbed a set of stairs to the kitchen, and briefly surveyed the kitchen. Upon hearing a fan on the second story, the troopers announced themselves and proceeded upstairs. In the master bedroom, the troopers observed the contents of a purse strewn about the floor, an open suitcase, and the naked, blood-spattered body of Sherry Miller lying on a bed with her legs spread, knees bent, and with a bloody pillow over her face. After confirming that Miller was not also in the bedroom, the troopers left, secured the house, and waited until investigators arrived with a search warrant.

An autopsy of Sherry Miller revealed that she died as a result of more than thirty stab wounds to her head, neck, chest, arms, and hands. The murder weapon, a knife, was found in a trash can; the tip had been broken off and was recovered from the shoulder of Sherry Miller. In addition to determining the cause of death, the forensic pathologist conducting the autopsy concluded that Sherry Miller had been subjected to forcible intercourse at the time of her death. This finding was premised, in part, upon the position in which her body was found, the defensive wounds on her hands and arms, the seminal material recovered from her vaginal vault, the absence of such material outside her vagina, and the absence of blood spatter in the area just above her vagina and between her legs.

From the crime scene, the police recovered Miller's bloody handprints on the pillow that was used to cover Sherry Miller's face. Furthermore, the police discovered a bloody footprint of Miller and a bandage with Miller's bloody fingerprint in the bathroom area. In addition, the police obtained a partial thumbprint from the murder weapon. [FN2: Although the print contained several characteristics consistent with Miller's right thumb, the partial print was insufficient for a positive identification.] The police noted that the box spring from the bed where Sherry Miller was found was broken, and the bed frame was bent. On the kitchen table, the police found a partially empty cup of coffee next to a vengeful note in Miller's handwriting. [FN3: In his note, Miller stated:

> Now I hope some of Sherry's whore friends learn something from this. I didn't want it to go this far, but you people don't understand what she put me through. Some know, but they don't want to say something about her. Everybody told her everything I did, but me, I had to find out for myself what she did. All of my so-called friends f--- me one way or another. I had no friends. And I wish I had more time to get even with some of you assholes. I just want to say that you, Larry Brown, I would have killed you, and you, Sean Smith, I told Donny one time before to tell you to leave her alone. I don't know if he did. And if he did, the next time somebody tells you something, you better do what they say. I would have got you too. I hope somebody in my family takes care

of Barb, Dennis.  I do love you all.  I will see some of you in hell.]

The police continued to search for Miller, contacting his friends and family members in an effort to locate him.  Although their efforts were unsuccessful, the police were able to trace Miller's flight from the crime scene to Maryland from his use of his wife's automated teller machine card, and the police found Sherry's vehicle in Maryland; the vehicle contained a baseball cap belonging to Miller and a number of ATM receipts.  Miller was ultimately apprehended six months later in Florida, after a tip following a description of the unsolved crime on the America's Most Wanted television program.

Commonwealth v. Miller (Miller I), 724 A.2d 895, 897–98 (Pa. 1999).

Trial commenced on September 29, 1997, following the denial of a motion to suppress and a waiver of Petitioner's right to a jury trial.  At the conclusion of the trial, the court found Petitioner guilty of first degree murder, rape, indecent assault, recklessly endangering another person, possessing an instrument of crime, and flight to avoid apprehension.  After the penalty phase, the court, sitting as fact-finder, issued a sentence of death, which was formally imposed on October 27, 1997.  The court considered the aggravating circumstance of committing the murder while perpetrating a felony, the rape, and the mitigating circumstance of the Defendant's substantially impaired capacity to confirm his conduct to the requirements of law.  The court found the aggravating circumstance to outweigh the mitigating circumstance and thus imposed the sentence of death.[1]

Petitioner filed a direct appeal to the Pennsylvania Supreme Court, challenging his conviction and sentence.  That court affirmed both the verdict and the death sentence.  Miller I, 724 A.2d 895.  Petitioner's writ of certiorari to the Supreme Court of the United States was denied on October 4, 1999.  Miller v. Pennsylvania, 528 U.S. 903 (1999).

On October 29, 1999 Petitioner filed a pro se petition under the Pennsylvania Post-

---

[1] The trial court also imposed a consecutive sentence of ten to twenty years for the rape conviction.

Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546.  An emergency stay of execution was entered pending the PCRA proceedings and counsel was appointed.  On June 7, 2000, Petitioner filed an amended PCRA petition, and thereafter filed several supplemental petitions and requests for discovery.  A hearing was held from October 27-29, 2003.

On June 30, 2007, the PCRA court issued an opinion and order denying relief.  Petitioner appealed this ruling to the Pennsylvania Supreme Court, and on December 28, 2009, that court affirmed the PCRA court's ruling, with Justice Thomas G. Saylor dissenting.  Commonwealth v. Miller (Miller II), 987 A.2d 638 (Pa. 2009).

On June 25, 2010, then Pennsylvania Governor Edward G. Rendell issued a death warrant, scheduling Petitioner's execution for August 19, 2010.  On July 15, 2010, I issued an Order staying Petitioner's execution; granting Petitioner in forma pauperis status; appointing the Federal Community Defender Office for the Eastern District of Pennsylvania, Capital Habeas Unit; and directing Petitioner to file his habeas petition within 120 days.  Petitioner filed the federal habeas petition presently under consideration on December 2, 2010, raising nine claims for review.

Petitioner claims that (1) trial counsel was ineffective for failing to effectively investigate, prepare, and present evidence that he acted in the heat of passion; (2) trial counsel was ineffective for failing to effectively investigate, prepare, and present testimony to rebut the Commonwealth's allegations that the victim was raped; (3) trial counsel was ineffective for failing to object to the testimony of Dr. Richard Callery about the occurrence of rape because this opinion fell below the required standard of proof, and for failing to raise this issue on appeal; (4) the Commonwealth withheld favorable and exculpatory evidence relating to Commonwealth witness Michael Torres in violation of Brady v. Maryland, and trial counsel was ineffective for

failing to properly investigate, develop, and present evidence discrediting this witness; (5) counsel was ineffective at capital sentencing for failing to conduct a meaningful investigation for mitigation evidence; (6) Petitioner's waiver of a jury at sentencing was invalid, and counsel was ineffective for failing to object to the waiver and for failing to raise this issue on appeal; (7) the prosecutor introduced inadmissible victim impact evidence in violation of Petitioner's constitutional rights, and counsel was ineffective for failing to raise and litigate this claim; (8) Petitioner's waiver of a jury trial and to testify in his own defense were invalid because they were the product of ineffective assistance of counsel; and (9) the cumulative effect of the errors in this case entitles Petitioner to habeas relief.

## II.    EXHAUSTION

### A.    Legal Standard for the Exhaustion of State Remedies and Procedural Default

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a prerequisite to the issuance of a writ of habeas corpus on behalf of a person in state custody pursuant to a state court judgment is that the petitioner must have "exhausted the remedies available in the courts of the State."[2]   28 U.S.C. § 2254(b)(1)(A).   In order to satisfy this requirement, a petitioner must have "fairly presented" the merits of his federal claims during "one complete round of the established appellate review process."   O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).   A federal claim is fairly presented to the state courts where the petitioner has raised "the same factual and legal basis for the claim to the state courts." Nara v. Frank, 488 F.3d 188, 198–99 (3d Cir. 2007).

---

[2] AEDPA additionally imposes a one-year period of limitations for filing an application for the issuance of a writ of habeas corpus.  28 U.S.C. § 2244(d)(1).  Here, Respondents agree that the habeas petition was timely filed.

If, however, a petitioner fairly presents a claim to the state courts, but it was denied on a state law ground that is "independent of the federal question and adequate to support the judgment," the claim is procedurally defaulted, and is not subject to federal review.  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  This includes instances where a state court refuses to hear the petitioner's federal claim on the grounds that the petitioner violated a state procedural rule. Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman, 501 U.S. at 750; Taylor, 504 F.3d at 427.  In this regard, the state court must actually rely on the procedural rule as an independent basis for disposing of the claim.   Harris v. Reed, 489 U.S. 255, 263 (1989); Caldwell v. Mississippi, 472 U.S. 320, 327 (1985).  Where the last state court's decision "fairly appear[s] to rest primarily on federal law or to be interwoven with federal law," no procedural bar will apply to the claim.  Coleman, 501 U.S. at 735; see also Campbell v. Burris, 515 F.3d 172, 177–78 (3d Cir. 2008); Johnson v. Pinchak, 392 F.3d 551, 557 (3d Cir. 2004).

Nevertheless, the violation of a state procedural rule does not automatically prevent federal review of the habeas claim.  The state procedural rule must have been "firmly established and regularly followed" at the time for the claim to be defaulted.  Taylor, 504 F.3d at 427 (quoting Ford v. Georgia, 498 U.S. 411, 423–24 (1991)).  Additionally, a federal habeas court is "not bound to enforce a state procedural rule when the state itself has not done so," even if the procedural rule could have properly been applied.  Holloway v. Horn, 355 F.3d 707, 714 (3d Cir. 2004) (quoting Smith v. Freeman, 892 F.2d 331, 337 (3d Cir.1989)); see also Cone v. Bell, 556 U.S. 449, 468 (2009) (finding that federal courts should not review a state court's decision not to apply its own procedural bar).

In some instances, it may be difficult to determine whether the state court resolved a claim on the merits or pursuant to a procedural bar.  See Coleman, 501 U.S. at 732 (noting that

state court decisions will often "discuss federal questions at length and mention a state law basis for decision only briefly"). To remedy this problem, the Supreme Court developed the "plain statement" test. <u>Michigan v. Long</u>, 463 U.S. 1032, 1041 (1983). Under the plain statement test, when the state court opinion appears to consider the application of a federal law, federal courts should assume that the case was determined on the merits absent a plain statement by the state court that its decisions relied on an independent and adequate state rule. <u>Id.</u>; <u>see also</u> <u>Harris v. Reed</u>, 489 U.S. 255, 262–63 (1989) (applying the plain statement rule to habeas review).

Where a claim is procedurally defaulted, it cannot provide a basis for federal habeas relief unless the petitioner shows "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750.

**B.      Have Any of Petitioner's Claims Been Procedurally Defaulted?**

Respondents assert that claims four, six, seven, and eight of Petitioner's habeas petition have been procedurally defaulted because Petitioner did not raise them at trial or on direct appeal.[3] (Resp. at 17–22.) I will discuss the issue of default regarding these claims in turn.

_____

[3] Additionally, in two footnotes which are embedded in their discussion of the merits of Petitioner's claims, Respondents argue that the PCRA court should not have considered the ineffectiveness of counsel claims relating to the rape conviction (claims two and three) because they were previously litigated before the Pennsylvania Supreme Court, that court having considered, on direct appeal, the sufficiency of the evidence for the rape conviction. (Resp. at 36 n.1, 41 n.3.) Insofar as Respondents assert that these claims have been procedurally defaulted, their argument is without merit for two reasons. First, complete consideration of these issues in state court cannot cause Petitioner's claims to be defaulted. To the contrary, evidence that a claim "has already been given full consideration by the state courts [makes it] <u>ripe</u> for federal adjudication." <u>Cone v. Bell</u>, 556 U.S. 449, 467 (2009) (emphasis in original) (citing 28 U.S.C. § 2254(b)(1)(A) (permitting issuance of a writ of habeas corpus only after "the applicant has exhausted the remedies available in the courts of the State")). Second, even if the prior litigation could act as a procedural bar, the Pennsylvania Supreme Court removed that bar by choosing to hear Petitioner's claims on PCRA appeal. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801 (1991) ("If the last state court to be presented with a particular federal claim reaches the merits, it

1.     **Claim IV:  Did the Commonwealth Violate <u>Brady v. Maryland</u> by Failing to Turn Over Impeachment Evidence, and Was Counsel Ineffective for Failing to Discover and Present Evidence to Discredit This Witness?**

Petitioner's fourth claim is that the Commonwealth violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by failing to turn over the criminal and medical records of his former cellmate, Michael Torres, who testified that Petitioner told him that he intended to kill his wife.  These records allegedly contained evidence of mental illness and hallucinations, which, according to Petitioner, could have been used to discredit Torres's testimony.  (Br. at 45–49.)  Petitioner relatedly claims that defense counsel was ineffective for failing to discover Torres's criminal history and mental illness.  (Br. at 56.)

On PCRA appeal, the Pennsylvania Supreme Court denied this ineffectiveness claim because defense counsel had "no reason to believe" that Torres suffered from mental health problems and because counsel "effectively undermined" Torres's testimony at trial by presenting his own witness.  <u>Miller II</u>, 987 A.2d at 654–55.  The court further found that there was no prejudice because Petitioner would have been convicted even if trial counsel had acquired the information about Torres.  <u>Id.</u>  Additionally, the court found Petitioner's <u>Brady</u> claim to be "meritless" because the government agency in control of the documents in question was not involved in Petitioner's prosecution.  <u>Id</u>. at 656.

The Pennsylvania Supreme Court's opinion on this claim "rest[s] primarily on federal law" because it relied on the application of the <u>Brady</u> case and the ineffectiveness of counsel standard.  <u>Coleman</u>, 501 U.S. at 735.  Moreover, the court made no mention of Petitioner's failure to object at trial or raise this issue on direct appeal.  <u>See</u> <u>Miller</u> <u>II</u>, 987 A.2d at 654–66 (discussing Petitioner's <u>Brady</u> claim, but making no reference to a procedural bar).  Since there

---

removes any bar to federal-court review that might otherwise have been available.").  As such, the prior consideration of claims two and three do not prevent federal review.

is no "plain statement" that the state court resolved this claim on the basis of an independent procedural rule, there is no procedural bar, and consequently, I will consider this claim on the merits.  Harris, 489 U.S. at 262–63.

### 2. Claim VI: Was Petitioner's Waiver of a Jury for Sentencing Invalid, and Was Counsel Ineffective for Failing to Object to the Trial Court's Colloquy and to Raise This Issue on Appeal?

Petitioner's sixth claim is that his waiver of the right to a jury at sentencing was invalid because the oral and written colloquies failed to inform him of the relevant burdens of proof for aggravating and mitigating factors or about the role of a jury in a capital sentencing.  Petitioner relatedly argues that trial counsel was ineffective for failing to object to the colloquy and raise this issue on appeal.  (Br. at 92–93.)

On PCRA appeal, the Pennsylvania Supreme Court considered the ineffectiveness of counsel claim on the merits, finding that Petitioner made no showing that he would not have waived his right to a jury at sentencing "but for counsel's ineffectiveness."  Miller II, 987 A.2d at 661.  This determination "rest[s] primarily on federal law" because it relied on the actual application of the ineffectiveness of counsel standard.  Coleman, 501 U.S. at 735.  Because there is no "plain statement" that the state court resolved this claim on the basis of an independent procedural rule, there is no procedural bar to addressing this claim on the merits.  Harris, 489 U.S. at 262–63.

The Pennsylvania Supreme Court did, however, apply a procedural bar in dismissing the underlying constitutional claim that the jury waiver colloquy was deficient.  The court stated that "[n]o objection was made as to the inadequacy of the colloquies at any time nor was the issue raised on appeal."  The court thus determined that the claim was "waived" because it could have been previously raised.  Miller II, 987 A.2d at 661.  By explicitly stating that the substantive

constitutional claim was waived, the court made a "plain statement" that this claim was procedurally barred.  Harris, 489 U.S. at 262–63.

As noted above, a disposition pursuant to a state procedural rule prevents federal review only where the procedural rule in question is "firmly established, readily ascertainable, and regularly followed."  Szuchon v. Lehman, 273 F.3d 299, 325 (3d Cir. 2001); see also Ford v. Georgia, 498 U.S. 411, 424–25 (1991) (finding a rule not announced at the time of the default is not firmly established). The procedural rule must be firmly established and regularly followed "as of the date the default occurred, not the date the state court relied on it, because a petitioner is entitled to notice of how to present a claim in state court." Fahy v. Horn, 516 F.3d 169, 188 (3d Cir. 2008) (citing Taylor, 504 F.3d at 428).

Historically, Pennsylvania applied a "relaxed waiver rule" which allowed petitioners in capital cases to bring claims on the merits which were not raised in the lower courts.  See Commonwealth v. McKenna, 476 Pa. 428, 439 (1978); Fahy, 516 F.3d at 188; Taylor, 504 F.3d at 428.  Citing concerns of judicial efficiency and finality, the Pennsylvania Supreme Court stopped applying the relaxed waiver rule to capital cases in 1998.  Commonwealth v. Albrecht, 720 A.2d 693, 699–701 (1998).  As a result, Respondents contend that the relaxed waiver rule does not apply to Petitioner's claim that the jury waiver colloquy was defective.  (Resp. at 17–21.)  Petitioner counters that his direct appeal went before the Pennsylvania Supreme Court on November 18, 1998, five days before the court announced its rejection of the relaxed waiver rule in Albrecht, and, accordingly, the change in waiver rule was not firmly established and regularly followed at the time of the supposed waiver.  (Reply at 5–6.)

Federal courts on habeas review have encountered Pennsylvania's change in waiver rules before, and have consistently found that claims argued before the Albrecht decision are not

procedurally barred by the change in waiver rules.  See, e.g., Morris v. Beard, 633 F.3d 185,190–91, 195–96 (3d Cir. 2011) (applying the relaxed waiver rule to statute of limitations for PCRA appeals because the default occurred in 1996); Laird v. Horn, 414 F.3d 419, 425 (3d Cir. 2005) (affirming the district court's decision that the petitioner's failure to raise his claim on direct appeal did not procedurally bar his federal claim because Pennsylvania used the relaxed waiver rule at the time he filed the appeal); Bronshtein v. Horn, 404 F.3d 700, 709 (3d Cir. 2005) (holding that the relaxed waiver rule applied to procedural default occurring October 20, 1998); Jermyn v. Horn, 266 F.3d 257, 279 (3d Cir. 2001) (finding no procedural default despite the state court finding that the claim was waived because, at the time of default, the Pennsylvania Supreme Court routinely reached the merits on such claims in capital cases).  Here, the procedural default occurred when trial counsel failed to object to the jury waiver colloquy on October 2, 1997, and when he failed to raise the issue on direct appeal on August 7, 1998.  See Fahy, 516 F.3d at 188.  Because these events occurred before Pennsylvania's waiver rule was firmly established and regularly followed, the application of the waiver rule is not an adequate ground to prevent federal review.  Laird, 414 F.3d at 425.  Consequently, Petitioner's claim that his sentencing colloquy was constitutionally deficient is not procedurally defaulted, and I will examine this claim on the merits.  Id.

3. **Claim VII: Did the Prosecutor Improperly Offer Victim Impact Evidence at Sentencing, and Was Counsel Ineffective for Failing to Object and Raise This Issue on Appeal?**

Petitioner's seventh claim is that the prosecutor committed misconduct in offering inadmissible victim impact testimony during the penalty phase.  There, Petitioner's daughter, Barbara Miller, held up a picture of her deceased mother and testified how her life had gone "downhill" after her death.  The prosecutor urged the court to consider the effect of Petitioner's

12

crime on the victim's family after having stated that other members of the victim's family declined to testify because it would be "too emotional."  In the same claim, Petitioner relatedly asserts that counsel was ineffective for not objecting at the time or raising the issue on direct appeal.  (Br. at 101–02.)

On PCRA appeal, the Pennsylvania Supreme Court dismissed the ineffectiveness claim because Petitioner failed to show prejudice because the prosecutor's comments were "innocuous" and the PCRA court had found that the victim impact evidence had no effect on the verdict ultimately rendered.  Miller II, 987 A.2d at 669–70.  This determination "rests primarily on federal law" because the court performed an ineffectiveness analysis.  Coleman, 501 U.S. at 735. Since there is no counteracting "plain statement" that the state court resolved this claim on the basis of an independent procedural rule, there is no procedural bar.  Harris, 489 U.S. at 262–63; see Miller II, 987 A.2d at 669–70 (discussing petitioner's victim impact claim, but making no reference to a procedural bar).

While the Pennsylvania Supreme Court clearly reached the merits of this ineffectiveness of counsel claim, Respondents argue that the underlying substantive claim of prosecutorial misconduct is procedurally defaulted because Petitioner failed to raise it on direct appeal.  (Resp. at 62.)  Respondents are correct that the Pennsylvania Supreme Court did not address the underlying claim of prosecutorial misconduct.  See Miller II, 987 A.2d at 669–70 (determining only that counsel's failure to object did not prejudice Petitioner).  This stands in contrast to the court's handling of claim six, where it explicitly noted a distinction between counsel's allegedly ineffective failure to object to a waiver colloquy and the underlying claim that the colloquy was deficient.  See id. at 661 (finding that "for purposes of the PCRA, the claim was waived because

it could have been raised previously" and "[c]onsequently, in order to obtain relief on this claim Appellant was obliged to establish that trial counsel was ineffective").

The Pennsylvania Supreme Court's failure to address the substance of claim seven does not render it procedurally defaulted.  Indeed, "[i]t is too obvious to merit extended discussion that whether the exhaustion requirement of 28 U.S.C. § 2254(b) has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in petitioner's brief in the state court."  Castille v. Peoples, 489 U.S. 346, 350 (1989) (quoting Smith v. Digmon, 434 U.S. 332, 333 (1978)).  Petitioner's claims need only be "presented to the state courts; they need not have been considered or discussed by those courts."  Swanger v. Zimmerman, 750 F.2d 291, 295 (3d Cir. 1984) (emphasis in original).

Additionally, mere silence on this issue cannot imply a procedural bar.  Ylst, 501 U.S. at 805.  Where the highest court is silent on whether the disposition of an issue rests on the merits or an independent procedural rule, courts "look through" the highest court's ruling to the decision of the lower court.  Id.  Where the upper court fails to address an issue, the "look through" doctrine assumes agreement with the lower court's disposition of the claim.  Id. at 804.

Here, the PCRA trial court clearly ruled on the substantive claim of prosecutorial misconduct.  Commonwealth v. Miller, No. 61-96, 2007 WL 7299000, at *36–38 (Pa. Ct. Com. Pl. July 2, 2007) (finding that "there was nothing improper about" asking the witness to show a picture to the court, and comments made during closing arguments "were neither improper nor prejudicial").  In fact, the lower court never once mentioned ineffective assistance of counsel when discussing the alleged misconduct during sentencing.

Nonetheless, there is some ambiguity as to whether Petitioner presented the substantive prosecutorial misconduct claim to the Pennsylvania Supreme Court on PCRA appeal.  (Pet'r's

Supreme Court Br. at 90–92.)  On one hand, Petitioner's brief dedicates two pages to discussing the ways in which the prosecution's victim impact evidence violated applicable law, and a mere two sentences to addressing defense counsel's alleged failures.  (Id.)  On the other hand, Petitioner stated, in reference to Commonwealth v. McNeil, 679 A.2d 1253, 1259–60, that "[t]here, as here, the issue was whether counsel was ineffective for failing to object to the victim impact evidence."  (Pet'r's Supreme Court Br. at 92 (emphasis added.))  Ordinarily, issues are not fairly presented if the court must read beyond Petitioner's brief, petition, or similar submission to discover a federal claim.  Baldwin v. Reese, 541 U.S. 27, 32 (2004).

Ultimately, I will treat the claim of prosecutorial misconduct as presented because the Pennsylvania Supreme Court effectively resolved this substantive issue on the merits through their analysis of the ineffectiveness claim.  Prosecutorial misconduct claims require a showing that the prosecution "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process."  Moore v. Morton, 255 F.3d 95, 105 (3d Cir. 2001).  Much like an ineffectiveness claim, courts must consider the extent to which the prosecution's conduct prejudiced Petitioner.  Id. at 107.  In considering the ineffectiveness claim, the Pennsylvania Supreme Court determined there was no prejudice resulting from the prosecutor's actions because the prosecutor's comments were "innocuous," and because the lower PCRA court did not consider the victim impact evidence in reaching its verdict.  Miller II, 987 A.2d at 669–70. In its finding of no prejudice, the court effectively determined the prosecutorial misconduct claim as well.  Moore, 255 F.3d at 105.  Because the underlying purpose of the procedural default doctrine is to allow state courts the opportunity to address alleged violations of federal law, the basic purpose of the procedural default doctrine is not undermined by federal review of this claim.  Coleman, 501 U.S. at 731–32.

**4.      Claim VIII: Were Petitioner's Waivers of Both the Right to a Jury Trial and to Testify in His Defense at the Guilt Phase Invalid Because They Were the Result of Unreasonable Advice from Counsel?**

Petitioner's eighth claim is that defense counsel's failure to investigate and develop his case made Petitioner's waiver of the right to a jury trial and to testify in his own defense the product of ineffective assistance of counsel.  (Br. at 109.)   The Pennsylvania Supreme Court denied this ineffectiveness claim for two reasons.  First, the court found that trial counsel's investigation and preparation were adequate.  Miller II, 987 A.2d at 660.  Second, the court concluded that Petitioner failed to show prejudice because he made no showing that he would not have waived these rights "but for counsel's alleged ineffectiveness."  Id.  This effectiveness determination "rests primarily on federal law" because the court applied the ineffectiveness standard and found two separate flaws with Petitioner's claim.  Coleman, 501 U.S. at 735.  Since there is no "plain statement" that the state court resolved this claim on the basis of an independent procedural rule, there is no procedural bar.  Harris, 489 U.S. at 262–63; see Miller II, 987 A.2d at 659–61 (discussing Petitioner's waivers at trial, but making no reference to a procedural bar to these claims).

Respondents do not appear to dispute that there is no procedural bar to this claim of ineffectiveness, but argue that "the substantive issue of whether Miller lawfully waived his right to a jury trial and his right to testify is procedurally defaulted."  (Resp. at 65.)  In his reply, Petitioner clarifies that this claim is "only raised as an ineffective assistance of counsel claim," and he did not intend to bring the substantive claim of whether the waivers were constitutionally defective.  (Reply at 48.)  Thus, Respondents' argument as to the procedural default of the underlying substantive claim is irrelevant, and I will address only the ineffectiveness claim on the merits.

### III.    THE MERITS OF PETITIONER'S CLAIMS

I now turn to the merits of Petitioner's claims. I will first set out the legal standard for the issuance of the writ of habeas corpus, and the <u>Strickland</u> standard, which applies to Petitioner's various claims of counsel's ineffectiveness.

### A.    Legal Standard for Issuance of the Writ of Habeas Corpus

Where the federal court reviews a claim that has been adjudicated on the merits by the state court, § 2254(d) permits the granting of a petition for habeas corpus only if (1) the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(1)-(2); <u>see</u> <u>Parker v. Matthews</u>, 132 S. Ct. 2148, 2151–53 (2012) (reiterating that the standard under § 2254(d)(1) is highly deferential to state court decisions and overturning the Sixth Circuit's decision granting habeas relief because the state courts decision denying relief was not objectively unreasonable).  Factual determinations made by the state court are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  <u>Palmer v. Hendricks</u>, 592 F.3d 386, 392 (3d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)); <u>Simmons v. Beard</u>, 590 F.3d 223, 231 (3d Cir. 2009) (same).

Interpreting this statutory language, the Supreme Court has explained that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000).  With respect to "the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.   The "unreasonable application" inquiry thus requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. As the United States Court of Appeals for the Third Circuit stressed, "[A]n unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable."  Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (citing Williams, 529 U.S. at 411).

Where the state court decision does not constitute an "adjudication on the merits," but the petitioner's claim is ripe for habeas review, § 2254 does not apply and instead the federal court applies the pre-AEDPA standard, reviewing pure legal questions and mixed question of law and fact de novo.  Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).  The state court's factual determinations, however, are still presumed correct pursuant to § 2254(e)(1).

**B.     The Strickland Standard**

Several of Petitioner's claims implicate alleged ineffective assistance of counsel as a basis for a claim of relief under the Sixth Amendment.  My discussion of these claims is thus guided by Strickland v. Washington, 466 U.S. 668 (1984).  According to Strickland, counsel is presumed to have acted effectively unless the petitioner can demonstrate both that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." Id. at 686–88, 693–94.  In assessing whether counsel performed deficiently, the court must "'reconstruct the circumstances of counsel's challenged conduct' and 'evaluate the conduct from counsel's perspective at the time.'"  Harrington v. Richter, 131 S. Ct. 770, 779 (2011) (quoting Strickland, 466 U.S. at 689).  Nonetheless, because the "ultimate focus of the inquiry [is] on the fundamental fairness of the proceeding whose result is being challenged . . . a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  Strickland, 466 U.S. at 696–97.  In fact, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which [the Supreme Court] expect[s] will often be so, that course should be followed."  Id. at 697.

**C.**     **Petitioner's Claims**

   **1.**     **Claim I: Was Petitioner's Counsel Ineffective for Failing to Effectively Investigate, Prepare, and Present Evidence that the Petitioner Acted in the Heat of Passion?**

   The heat of passion defense reduces a homicide from first-degree murder to voluntary manslaughter when, "at the time of the killing, [the defendant] is acting under a sudden and intense passion resulting from serious provocation by . . . the individual killed."  18 Pa. C.S. § 2503(a).  While trial counsel relied on this defense at trial, Petitioner contends that counsel was ineffective for failing to investigate, prepare, and present additional evidence that he acted in the heat of passion.  Petitioner faults counsel for failing to call Dr. Gerald Cooke, a psychologist, who testified at the PCRA hearing that he would have opined that "Petitioner killed his wife 'consistent with explosive rage.'"  Petitioner further faults counsel for failing "to obtain records showing that two days before the victim was killed, Petitioner was served with an Order of child support, even though they were living together," and for failing to interview family members

who had information that was helpful to this defense. (Br. at 7–27.)

### a.    Trial Evidence

In his closing argument, Petitioner's trial counsel argued "that this was a crime of rage[,] that there was no malice in Dennis Miller towards Sherry Miller [and that] [t]he killing was done as a result of an uncontrollable act." Counsel urged the judge to "look to the subtle testimony here a little bit and the testimony that came out about their relationship, the testimony that came out about what occurred at Trib's Waystation [the bar where Petitioner and the victim were] that night and how one witness told you that Dennis seemed to snap into a rage and then he was able to calm himself down." (N.T. 10/01/97 at 267–68.)

The testimony referred to above about Petitioner's relationship with the victim came from Agnes Miller, Petitioner's mother. She testified that her son's relationship with the victim was rocky and riddled with substance abuse, and that while they "ha[d] a good marriage [] at the start," the marriage deteriorated because "both of them had a problem with drugs . . . and drinking." (N.T. 09/29/97 at 30.) Additionally, one of the state troopers who investigated the missing person's report, and ultimately found the victim's body, testified that he was familiar with Petitioner's history of drug use and that during the missing person's investigation, the victim's mother and Petitioner's sister had expressed concerns to him about the couple's drug use. (Id. at 43–44.)

The witness who discussed how Petitioner snapped into a rage at the bar on the night of the murder was the bartender, Lisa Folk. Ms. Folk testified that at around 11 p.m., when another man at the bar was talking to the victim, "[Petitioner] just got a real angry, evil look on his face []. Yelled across the bar, I don't need this shit . . . He was like in a rage." She continued, stating that Petitioner then went over to talk to the victim, "they like worked it out," and Petitioner

calmed down.  Later in the night, at around midnight, the victim asked Ms. Folk to beep Sean

Smith (who was mentioned in the note that Petitioner left at the scene), and the victim then spoke

to Smith when he called the bar back.  Shortly thereafter, the victim asked Ms. Folk if she could

go into the bathroom with Petitioner so that they could do a "line" of methamphetamine together.

Ms. Folk saw them go into the bathroom, and then she saw them leave the bar sometime after

12:30 a.m.  (N.T. 09/30/97 at 213–19.)

### b.        The PCRA Hearing

### i.        Expert Testimony

At the PCRA hearing, Petitioner presented the testimony of Dr. Gerald Cooke, a clinical

and forensic psychologist who evaluated Petitioner before trial and testified at the penalty phase

hearing, and Dr. Julia Kessel, a psychiatrist who examined Petitioner before the PCRA hearing.

At the penalty phase hearing, Dr. Cooke testified that Petitioner told him that, on the night of the

murder, after he and the victim had sex, "he went into a rage and grabbed a knife that was by the

side of the bed" after the victim told him "that she wanted him to move out the next day and was

moving her boyfriend Sean in."  Although Dr. Cooke had been aware of Petitioner's drug use,

and further testified at the penalty phase hearing that Petitioner "is an angry man" who "can go

into rages particularly when he's disinhibited by alcohol and drugs," trial counsel did not call

him to testify in support of the heat of passion defense during the guilt phase of the trial.  (N.T.

10/02/97 at 293–302.)

At the PCRA hearing, Dr. Cooke testified about additional evidence and information that

he had learned after trial and sentencing.  Dr. Cooke relayed that he learned the victim had a

support order issued against Petitioner two days before the murder, and that Barbara Miller, the

daughter of Petitioner and the victim, believed that a knife was kept in the night stand in the

room where the homicide occurred.  Dr. Cooke also testified that he had not been aware that,

under Pennsylvania law, a series of cumulative events would be relevant to whether there was

sufficient provocation.  With the benefit of this additional information, Dr. Cooke stated that,

"[i]n [his] opinion, [Petitioner] was in an explosive rage . . . [and] would have met the heat of

passion defense."  (N.T. 10/23/03 at 445.)  Dr. Cooke elaborated as follows:

> There are a number of factors.  It starts with the diagnosis itself.   And that is, we
> have somebody who is, by virtue of his personality makeup, can be easily
> provoked to become angry, to see himself as being slighted, mistreated, rejected
> and to react with an intent to rage to that kind of perception.
>
> Secondly, assuming that there is substantial evidence of drug and alcohol use
> during the period prior to that, that the drugs and alcohol would have contributed
> by disinhibiting him, as I explained before.  Thirdly, I now know about the child
> support order, which I was not aware of before.  Fourth, would have been Sherry
> Miller's affair with Sean Smith and the telephone calls to him that night, and I
> was aware of those.  Fifth would have been her demand to move out and Sean
> move in as they lay there in bed, and I was aware of that.  But, finally, Barbara
> Miller's statement that her mother kept a knife in the bedroom where she was
> stabbed, and I was not aware of that piece of information and now that plays a
> factor as well.

(Id. at 445–46.)   At the PCRA hearing, Dr. Kessel testified similarly to Dr. Cooke,
stating:

> My opinion is that at the time that [Petitioner stabbed the victim], he had
> experienced a sequential number of stressors in their relationship that were
> provocative.  And on the evening that this occurred, he experienced, in response
> to discussion and a series of events, a sudden and intense rage that cause him to
> lose control of his behavior, to put it simply, on that evening.

(Id. at 544.)  Dr. Kessel explained that she based this opinion on a variety of factors.  She

testified that between 1991 and 1995, the victim was involved with two other men, which

"caused [Petitioner] to feel very betrayed and hurt, and yet also did not interrupt the cycle that

had become their pattern, which was to break up, get back together, break up, get back together,

and become violent in between."  She testified that Petitioner "became increasingly violent[,] . . .

spen[ding] 10 months in jail for violating a protection from abuse order," and that after he got

out of jail (two months before the murder) the couple's drug use escalated.  Though there was still a protection from abuse order, the couple lived together, and on the week prior to the murder Petitioner learned that the electric and phone bill in their home was in another man's name, which only escalated his "sense of betrayal, his anger, his feeling of hurt."  (Id. at 544–46.)

Dr. Kessel testified that on the morning of the murder, Petitioner "had been served with [child support] papers suggesting that [the victim] actually was going to ask him to leave."  At the bar, on the evening of the murder, the victim talked on the phone and in person with other men, which made Petitioner "very angry, suspicious, and jealous."  After the couple went home, according to the account which Petitioner gave to Dr. Kessel, he and the victim "danced and had sex, but as they went upstairs to go to bed [] he began to accuse her of who was this man that she was talking to at the bar, and was she having a relationship with him, and who was on the phone."  Dr. Kessel continued that "they began to argue about the sincerity of her wanting to come back to him, and his feeling distrustful of her.  And in the escalation of that discussion she acknowledged that she had been on the phone with this man."  Dr. Kessel concluded that "those are some of the events that precipitated this sudden and intense rage."  (Id. at 546–47.)

## ii.      Family Testimony

Petitioner presented the testimony of several family members at the PCRA hearing, including his mother, Agnes Miller (who also testified during trial), one of his sisters, Brenda Miller, the victim's sister, Helen Pennington, and his daughter, Barbara Miller.  Agnes Miller testified that her son and the victim used drugs, fought a lot, and broke up several times.  After he was released from jail, about two months before the murder, Petitioner came to live with her. Petitioner then moved back in with the victim, but soon returned to his mother's house. Petitioner's mother further testified that, shortly before the murder, the victim came and begged

Petitioner to come back with her.  Petitioner then told his mother that he loved the victim and was getting back with her.  (N.T. 10/28/03 at 364–66.)

Helen Pennington, the victim's sister, testified that she took her sister to get an abortion. The victim told Ms. Pennington that Petitioner was not the father, but rather Larry Brown.  (Id. at 513, 517.)  (Larry Brown's name was also mentioned in the note which Petitioner left at the scene of the crime.)  In this regard, Petitioner's sister, Brenda Miller, testified that in 1993 or 1994 Petitioner told her that the victim had an abortion of another man's child, and that she could see, at the time, that Petitioner was upset by this.  (N.T. 10/29/03 at 428.)

Barbara Miller, the couple's daughter, testified that while her early childhood was a "normal, nice life," her parents started having problems as she got older.  She testified that they would fight about money and drugs, and that her parents broke up a few times.  She stated that while her father was in jail before the murder, another man, Sean Smith, stayed at their house.  In addition, Barbara testified that two knives were kept in the bedroom where her mother was killed, and that the bed was already broken before the murder.  Barbara stated that she would have been willing to testify about this at trial.  (N.T. 10/28/03 at 378–89.)

### iii.      The Pennsylvania Supreme Court Opinion

On PCRA appeal, the Pennsylvania Supreme Court addressed whether counsel was ineffective for failing to investigate, prepare, and present evidence that Petitioner acted in the heat of passion.  In so doing, the court focused primarily on the prejudice prong of Strickland, beginning its analysis by laying out the legal framework for the heat of passion defense.

> A person is guilty of "heat of passion" voluntary manslaughter "if at the time of the killing [he or she] reacted under a sudden and intense passion resulting from serious provocation by the victim."  Commonwealth v. Ragan, [] 743 A.2d 390, 396 (1999).  "'Heat of passion' includes emotions such as anger, rage, sudden resentment or terror which renders the mind incapable of reason."  Commonwealth v. Mason, [] 741 A.2d 708, 713 (1999).  An objective standard is

applied to determine whether the provocation was sufficient to support the defense of "heat of passion" voluntary manslaughter.  Commonwealth v. Laich, [] 777 A.2d 1057, 1066 (2001).  "The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was incapable of cool reflection."  Commonwealth v. Thornton, [] 431 A.2d 248, 252 (1981).

Miller II, 987 A.2d at 649–50.

The court then noted that the PCRA court had stressed that "the refusal of Appellant to testify handicapped trial counsel because he was unable, without Appellant's testimony, to establish Appellant's state of mind at the time of the killing."  Id. at 650.  The Supreme Court concurred with the assessment of the PCRA court, stating that, without Appellant's testimony, "the additional evidence fails to establish that the killing resulted from a sudden and intense passion resulting from serious provocation caused by the victim contemporaneously with the killing."  Id.  The court elaborated on this point:

> [W]ere we to consider the additional evidence and testimony Appellant claims trial counsel was ineffective for not presenting at trial, which concerns his wife's alleged infidelity and their stormy relationship, it is clear that the evidence still was insufficient to conclude that the killing was committed in the heat of passion as the record is devoid of evidence that at the time the victim was murdered, Appellant was acting under a sudden or intense passion brought on by the victim. While Appellant claims that the victim's apparent infidelity and flirtatiousness, when coupled with his own mental state, were sufficient to cause him to act with sudden and intense passion, we note Appellant was well aware of his wife's proclivities prior to the day of the killing and trial counsel introduced evidence establishing this. Thus, the evidence Appellant claims should have been introduced on this issue was merely cumulative of evidence already presented at trial. Moreover, the evidence shows that although Appellant and his wife argued while together at the bar, he calmed down and appeared to be in control of his faculties following the argument. N.T. 9/30/97, 213, 220. Also the note Appellant left at the scene evinces that he had not acted in the "heat of passion" but rather in a calculating manner.

Id. at 650–51.  In light of having concluded that there was an "absence of evidence about what precipitated the killing," the court found "the testimony of the expert witnesses was irrelevant,"

in that there must be evidence of provocation before inquiring into the defendant's state of mind at the time of killing.  Id. at 24 (citing Commonwealth v. McCusker, 292 A.2d 286 (1972)).

### c.    Petitioner's Arguments

Petitioner urges that his trial counsel was ineffective on the heat of passion issue and singles out three aspects of the Pennsylvania Supreme Court's PCRA appeal opinion as being an unreasonable determination of the facts.[4]  First, he points to trial counsel's alleged deficient investigation regarding heat of passion.  He stresses that the court unreasonably ignored evidence that, on the evening of the homicide, the victim demanded that Petitioner move out since her boyfriend Sean Smith was moving in with her.  (Br. at 20.)

As the Supreme Court noted, Petitioner did not testify at trial, nor did he testify at the PCRA hearing.  Instead, evidence that the victim demanded on the night of the murder that Petitioner move out was presented at the PCRA hearing through the testimony of Dr. Cooke and Dr. Kessel, who testified that Petitioner told them of the victim's demand in their out-of-court evaluations of him.  This information was important to Dr. Cooke and Dr. Kessel because it informed their opinions that Petitioner killed the victim while in a "rage."  Nevertheless, in the absence of Petitioner's testimony, it was entirely reasonable for the Pennsylvania Supreme Court to choose not to rely on the experts' secondhand, and after-the-fact, account of what happened before the murder.  This argument therefore fails.

Second, Petitioner contends that, because "hardly any evidence of provocation was presented" at trial, the "Supreme Court's assertion that the post-conviction evidence was 'cumulative' of what was presented at trial was unreasonable."  (Br. at 21.)  As noted above, Petitioner's mother testified during the trial that the relationship between Petitioner and the

---

[4] For sake of clarity, I will address Petitioner's arguments in a different order from which they were presented in his memorandum.

victim was riddled with instability and substance abuse, and Lisa Folk, the bartender, testified about Petitioner's "rage" and the couple's drug use at the bar on the evening of the murder.  At the PCRA hearing, Petitioner's mother testified about the couple's drug use and how they broke up and got back together prior to the murder.  Petitioner's daughter testified that another man was living at the house when Petitioner was in jail, and that two knives were kept in the bedroom where the victim was killed.  Between the testimony of Petitioner's sister and the victim's sister there was evidence presented that the victim had an abortion in 1993 or 1994, that another man was the father, and that Petitioner knew about the pregnancy and was upset by it.  The expert witnesses concluded that, in light of this and other information, Petitioner killed the victim while in an "explosive" or "sudden and intense rage."

While I agree that the post-conviction evidence from the family members and Dr. Cooke and Dr. Kessel was more expansive than that which was presented at trial, I do not find the Pennsylvania Supreme Court's characterization of this evidence as "cumulative" to be unreasonable.  The post-conviction evidence simply elaborated upon the trial evidence of the couple's unstable relationship and drug use, and did not shed any light on what occurred immediately before the murder.  Significantly, the post-conviction evidence did not include Petitioner's testimony, nor did it include the testimony of any witnesses who saw Petitioner and the victim after they left the bar.  Because the Supreme Court's determination of the facts here was reasonable, this argument also fails.

Petitioner's third argument is closely related his second argument.  He asserts that the court unreasonably concluded that "evidence showing a history of minor disputes and allegations of past infidelity has not been held to be sufficiently provocative."  Petitioner contends that the decisions the court cited to in support of this proposition "did not involve the level of

provocation in Petitioner's case." (Br. at 21.) Respondents reply that although this is presented as an unreasonable factual determination, it is better understood as an "argument that the [court] did not follow state law, which is not a ground for federal habeas relief." (Resp. at 27–28.)

I need not delve into this issue of whether this claim is cognizable. Rather, I view Petitioner's argument here as going directly to the ultimate prejudice inquiry of <u>Strickland</u>, <u>i.e.</u>, whether there was a reasonable probability that an objective factfinder would have concluded, with the benefit of the additional evidence presented at the PCRA hearing, that Petitioner acted in the heat of passion. <u>Strickland</u>, 466 U.S. at 694.

The answer to this question is "no." As explained above, Petitioner did not present any meaningful evidence at the PCRA hearing regarding what actually occurred in the time period immediately preceding the murder. Instead, and as the Supreme Court noted, the evidence at trial indicated that Petitioner and the victim argued while they were at the bar on the evening of the murder, and Petitioner calmed down before they left. Additionally, the note which Petitioner left at the scene recounted how he perceived the victim and others to have wronged him, and did not lend support to a heat of passion defense. Because Petitioner was not prejudiced by trial counsel's failure to present the additional evidence pertaining to the heat of passion defense at trial – and the Pennsylvania Supreme Court's conclusion in this regard was reasonable – Petitioner is due no relief on this claim.[5]

---

[5] Petitioner also contends that the Pennsylvania Supreme Court's decision was an unreasonable application of the law because the court did not apply the correct standard when addressing the prejudice prong of <u>Strickland</u>. As <u>Strickland</u> sets out, in order to prove prejudice the petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. The court, however, at one point, referenced an outcome-determinative test, stating that "[t]he PCRA Court's reasons for rejecting this claim were correct as they indicate that the court had considered and rejected the evidence submitted at trial by Appellant regarding his claim that the killing was committed in the heat of passion and that the additional evidence would have resulted in a different outcome."

2.     **Claim II: Was Petitioner's Counsel Ineffective for Failing to Adequately Investigate, Prepare, and Present Testimony to Rebut the Commonwealth's Allegations that the Victim Was Raped?**

Petitioner next argues that trial counsel was ineffective within the meaning of Strickland for failing to adequately investigate, prepare or present testimony to rebut the Commonwealth's rape allegation.  He specifically takes issue with counsel's failure to consult with an expert before trial regarding the Commonwealth's rape evidence, which he describes as forensic and circumstantial.  Petitioner urges that but for the ineffective assistance of counsel, there is a reasonable probability that he would not have been convicted of rape.  Because the finding of rape during the commission of the homicide was the sole aggravating factor leading to the death sentence, Petitioner contends that he is entitled to habeas relief both with respect to his rape conviction and his death sentence.  (Br. at 27–39.)

a.     **Dr. Callery's Testimony and Expert Opinion**

The testimony of Dr. Richard T. Callery, the medical examiner who conducted the autopsy of the victim, established the basis for the rape conviction and death sentence.  Dr. Callery first testified three weeks before the trial, at a pretrial hearing.  There, he explained that, in addition to the autopsy, he reviewed both photos and a videotape of the crime scene.  He stated that the cause of death was "as a result of massive external and internal bleeding due to multiple stab wounds to the head, neck, chest and upper extremities," and that the evidence was "consistent with sexual activity going on during the assault."  (N.T. 09/08/97 at 28.)  Dr. Callery

---

Miller II, 987 A.2d at 650.  Despite this reference, I find that the state court did not unreasonably apply Strickland.  Indeed, before considering any of Petitioner's claims, the court identified the appropriate Strickland standard, stating that, "to prove prejudice, a defendant must show that but for counsel's error, there is a reasonable probability, i.e., a probability that undermines confidence in the result, that the outcome of the proceeding would have been different." Miller II, 987 A.2d at 649 (citing Commonwealth v. Sneed, 587 Pa. 318, 899 A.2d 1067, 1084 (2006)) (citing Strickland, 466 U.S. at 694)).

based this opinion on four main pieces of evidence: (1) the position of the decedent's body (she was on her back and her legs were spread apart); (2) a "full volume" of seminal fluid in the decedent's vagina; (3) decedent's defensive wounds on both her left and right hand; and (4) the blood spatter patterns at the crime scene.  (Id. at 10–30.)

Trial counsel was then given an opportunity to cross examine Dr. Callery.  Dr. Callery admitted that he did not find blood in the decedent's vagina, and that he was unable to draw a distinction between whether a rape occurred during or after the murder.  Dr. Callery stated that he nonetheless believed that this was a "classic rape-homicide."  (Id. at 30–43.)

At trial, and consistent with his pretrial hearing testimony, Dr. Callery testified that, at the time of death, the victim was on the bed with her legs spread apart in the female missionary position, and that "several tablespoons" of semen were found in her vaginal vault.  (N.T. 09/30/97 at 153.)  Dr. Callery testified that this amount of semen was significant in determining when intercourse occurred because

> if the semen were put there before the attack began, [and] the decedent was up and about and walking about and moving about, one would expect to find the semen less focused in the vault.  It would be distributed in a wider pattern, for example, maybe in the bed sheets beneath the body, maybe in another room, whatever, maybe in some other area.  But the abundant bolus or focal amount that I saw there would argue that there was less, rather than more, movement of that portion of the body.

(Id. at 154–55.)  Dr. Callery further testified that "[the evidence] is consistent with the stab wounds being inflicted with the decedent in the female missionary position with the assailant in the male superior missionary position," and that "[it] appears from the scene, from the autopsy findings and the blood pattern that the attack and the assault to the vaginal area were concomitant or occurring within the same general time frame."  (Id. at 155–56.)  It is important to stress that this testimony formed the sole basis for the aggravating factor that led to the imposition of death.

Trial counsel then conducted an exceedingly brief cross examination of Dr. Callery. While the direct examination comprises fifty pages of the trial transcript, the cross examination was limited to only eight pages, which is about half as long as counsel's cross examination of Dr. Callery at the pretrial hearing.  (Id. at 158–66.)

I am cognizant that the length of a cross examination is not a reliable indicator of counsel's preparation, but an examination of counsel's cross examination reflects that he did nothing more than allow Dr. Callery to reiterate his direct examination and clarify his opinion. Careful review of the cross examination reveals only <u>one</u> instance where counsel attempted to undermine Dr. Callery's theory.  This came when Dr. Callery acknowledged that it was "conceivable" that the sexual intercourse did not occur during the commission of the homicide.

> Q: [] What I'm asking you, Doctor, is it's not inconceivable, is it, that there could have been sexual intercourse, the victim not get up off the bed and walk about, and then an attack took place, and that the sexual intercourse was not then related to the attack?
>
> A: I testified before that I thought this was a typical rape/homicide, but the way you phrased the question, that it is not inconceivable, is there a scenario that could be conceived of that, going along with what you say, I would have to say that it is conceivable.

(Id. at 165–66.)  In short, trial counsel's only strategic point made with Dr. Callery was that it was "conceivable" that the intercourse occurred before the killing. Other than this obvious concession, one that experts routinely make, counsel had no apparent theory to undermine this crucial witness. Nor did counsel consult with or call a witness to rebut this testimony.

Based on Dr. Callery's opinion, the trial judge found Petitioner guilty of rape by forcible compulsion, concluded that Petitioner "committed a killing while in the perpetration of a felony, in this case the rape," and ordered that Petitioner be executed.  (N.T. 10/02/97 at 341.)  This was the sole aggravating factor which resulted in the death sentence.

### b.    The PCRA Proceeding

In his PCRA petition, Petitioner argued, as he does here, that trial counsel was ineffective for failing to consult with an expert before determining that the cross examination of Dr. Callery would be sufficient to rebut the Commonwealth's allegation of rape.  Petitioner retained two experts who supported this argument and who, along with trial counsel, testified at the PCRA evidentiary hearing.

### i.    Trial Counsel's PCRA Testimony

At the PCRA hearing, trial counsel was extensively questioned about his strategy to defeat the rape charge.  He testified that his "initial goal was to save [Petitioner's] life, was to somehow get rid of the death penalty."  (N.T. 10/27/03 at 18.)  To this end, counsel explained that he "primarily focused on the rape," because he "didn't believe the Commonwealth could prove rape."  (Id. at 19–20.)  Regarding Dr. Callery's testimony, counsel stated that he "didn't believe their doctor and [] was shocked that anybody did.  I think anybody who looked at the evidence and looked at what the doctor said could clearly see that the doctor was not being truthful."  (Id. at 20.)  Trial counsel explained that when Dr. Callery said on cross examination that "this is a classic rape case," he "didn't believe a word he said." Counsel acknowledged that his cross examination of Dr. Callery "must not have been very good" because "Judge Riley believed [Dr. Callery]."  (Id. at 20–21, 85.)

Trial counsel then acknowledged that he had never consulted with any expert regarding the rape charge or Dr. Callery's theory.  (Id. at 22.)  Strikingly, and as it pertains to the first prong of the Strickland standard of counsel's performance, when asked whether he "ha[d] any tactical or strategic reason" for not consulting with an expert, counsel answered "[n]o."  (Id. at 23.)  When asked to explain his approach in defending the rape charge, counsel testified:

I don't know if it was that I had tunnel vision.  It was just so obvious to me that there was not a rape in this case.  And I truly felt anybody who looked at it would see that.  And my recollection is that the doctor, when he testified, contradicted himself in certain areas that made it obvious that he was there because he had something he wanted to say, but what he had to say made no sense as to the facts of how this thing occurred.  And I don't know, somehow I don't know what I missed.  I missed something somewhere.  And I still have missed it.  I don't get it.

(Id. at 85–86.) (emphasis added.)

Trial counsel then went on to state that he had a chance to cross examine Dr. Callery at the pretrial hearing, and reviewed the doctor's report, a crime scene video, photographs, and other physical evidence that was found at the crime scene.  (Id. at 86.)  When asked whether this review informed his "belief that cross-examining [Dr. Callery] would be sufficient to demonstrate what you articulated as the deficiencies," counsel stated "I believe so."  (Id. at 86.)  However, when pressed as to why he did not consider it necessary to consult with an expert, counsel testified:

It's difficult for me to answer that.  It just goes back to something I saw, that to me it was evident that everyone would see it, but apparently they didn't.  There just wasn't a rape in this case.  I guess I shouldn't have relied upon my belief to that, but that belief was based upon my experience.

(Id. at 87.)

Finally, counsel indicated that while he did not remember what he did to rebut the rape evidence, he knew he "did something."  He stated that he had a tendency over the years to "collect things" in files during his cases.  He could not, however, recall if he did something similar with the rape issue in this case.  Counsel also testified that he occasionally "r[a]n things by" his personal doctor, though again he could not say whether he had done so in this case.  He stated that he knew through preparation that he consulted materials he had or ran it by someone but he could not remember what it was he actually did in this case.  (Id. at 100, 104.)

ii.     **Expert Testimony Regarding the Rape Evidence Presented at the PCRA Hearing**

At the PCRA hearing, Petitioner presented the testimony of two expert witnesses. The first expert was Dr. Peter R. De Forest, a professor of criminalistics at John Jay College of Criminal Justice. Dr. De Forest testified that after having reviewed Dr. Callery's testimony, laboratory reports, crime scene photographs, video, and physical evidence such as the bedding and the rape kit, it was his opinion that while there was evidence of both a homicide and sexual intercourse having occurred "at some point," there was no evidence of a rape. (N.T. 10/28/03 at 285.)

Dr. De Forest then opined about the evidence Dr. Callery relied upon in determining that a rape occurred during the homicide. Dr. De Forest explained that the blood spatter patterns were inconsistent with Dr. Callery's theory that the victim was in the female missionary position when she was killed. Rather, it was Dr. De Forest's opinion that the patterns were "consistent with either an inclusion or blocking the thigh of the assailant when he was straddling the victim, or some other object high on the abdomen that protected the lower portion from being stained." (Id. at 286.) In this regard, Dr. De Forest explained that the decedent's defensive wounds did not indicate rape, only that the assailant was poised above her. He further opined that the body may have been moved after the stabbing occurred because it had diluted blood marks on it, run marks on the legs, and areas of the comforter had extensive airborne blood staining "[t]hat would not have been accessible . . . as the bedding is viewed in the crime scenes and videotape." (Id. at 288.)

With respect to the fluid found in the victim's vagina, Dr. De Forest called attention to the fact that Dr. Callery had not measured or tested the fluid, and thus the presence of the fluid "could not be relied upon" since there was no way to discern how much of it was seminal. (Id.)

Dr. De Forest further testified that as part of his work, he is often called upon by defense attorneys to advise them on how to cross examine an expert witness, and he could have provided those services to trial counsel had counsel consulted him before the trial.

The second expert to testify about the rape was Dr. Charles Wetli, Chief Medical Examiner for Suffolk County, New York.  Dr. Wetli similarly concluded that while "there was evidence of recent sexual intercourse[,] [t]here was no evidence of forcible rape."  (Id. at 330.) Dr. Wetli based his conclusion on several factors.  He noted the lack of any trauma "whatsoever" to the decedent's genital region, or evidence of strangulation or asphyxiation which he opined "almost invariably accompanies a forcible sexual assault."  (Id. at 330–31.)  He stated that the amount of fluid found in the vagina indicated sexual intercourse but not necessarily rape. (Id. at 335.)  Dr. Wetli further opined that the defensive wounds were more consistent with the perpetrator straddling her chest as opposed to having intercourse with her.  (Id. at 333.)

### c.   Application of **Strickland**

Having carefully reviewed both the trial and PCRA record I will next consider whether Petitioner's trial counsel exercised reasonable professional judgment when he failed to consult an expert about the rape evidence and in choosing to rely solely on cross examination to undermine Dr. Callery's opinions.  See Strickland, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").  In examining counsel's choice, I will "focus on whether the investigation supporting counsel's decision not to introduce . . . evidence . . . was itself reasonable," Wiggins v. Smith, 539 U.S. 510, 523 (2003), while "applying a heavy measure of deference to counsel's judgments."  Id. at 521–22 (quoting Strickland, 466 U.S. at 691).  I recognize that the proper examination is not whether trial counsel should have consulted with an expert before cross

examination, but whether the considerations that went into his decision not to consult an expert were themselves reasonable.  See Rompilla v. Beard, 545 U.S. 374, 387 (2005) (defense counsel has duty to investigate facts which are relevant to the merits).

As noted above, trial counsel was able to cross examine Dr. Callery, the Commonwealth's sole witness regarding the rape charge, during a pretrial hearing held three weeks before trial.  Thus, counsel was well aware that the Commonwealth's rape evidence relied almost exclusively on forensic testimony, and that Dr. Callery based his opinion that a rape occurred during the homicide on the position of the decedent's body, the amount of seminal fluid found in the decedent's vagina, the nature of the decedent's defensive wounds, and the blood spatter pattern at the crime scene. Despite knowing all of this, counsel chose not to consult an expert and relied solely on his own experience and cross examination, and did so without any expert assistance to prepare that cross examination.

When asked to explain this tactic at the PCRA hearing, counsel stated that other than relying on his intuition that "there was not a rape in this case," he could not articulate with any specificity what considerations went into his decision not to consult with an expert.  Trial counsel's stated tactical reasons rested solely on his "belief," "experience," "something he saw," and his insistence that Dr. Callery was lying.  It is worth repeating that when asked whether he had a tactical or strategic reason for not consulting with an expert on the aggravating circumstance that supported the death penalty, trial counsel simply stated "no."[6]

The United States Supreme Court has noted that there are "[c]riminal cases . . . where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both."  Harrington, 131 S. Ct. at 788.  The Third

---

[6] In again referencing counsel's complete lack of explanation for not consulting with an expert, I reiterate that the Strickland standard is objective.

Circuit has similarly stated that the retention of an expert witness is necessary "depend[ing] on the specific circumstances of the case." Showers v. Beard, 635 F.3d 625, 633 (2011). Given the scientific and technical nature of Dr. Callery's forensic testimony – and in light of the fact that this testimony formed the sole basis of the rape conviction and death sentence – I am left to conclude that consultation with an expert would necessarily be part of a reasonable defense strategy. And these experts were available. Dr. Callery's opinions involved anatomy, crime scene forensics, blood spatter patterns, and reproductive knowledge, all areas outside of a lawyer's expertise. Because trial counsel did not consult with an expert to either prepare for cross examination or to present as a witness to rebut the allegation that a rape occurred during the homicide, I find that his performance was constitutionally deficient.

Trial counsel's cross examination of Dr. Callery supports this conclusion. As noted previously, the only identifiable strategy displayed by counsel was to have Dr. Callery concede that it was "conceivable" that a rape did not occur during the commission of the homicide. Having an expert admit that an opposite conclusion is "conceivable" hardly qualifies as adequate Sixth Amendment representation.

Trial counsel's failure to consult with an expert before cross examination is exacerbated when viewed in conjunction with the opinions provided at the PCRA hearing by Dr. De Forest and Dr. Wetli. The PCRA court accepted both Dr. De Forest and Dr. Wetli as experts at the PCRA hearing, and for good reasons. Dr. De Forest is a professor of criminalistics at John Jay College of Criminal Justice. (N.T. 10/28/03 at 265.) He has a bachelor of science degree in criminalistics from the University of California at Berkeley and a doctorate in criminology degree in criminalistics from the University of California at Berkeley. (Id. at 265–66.) Before becoming a professor, Dr. De Forest worked in a sheriff's crime lab in California. (Id. at 266.)

As of 2003, Dr. De Forest had consulted in his capacity as a criminalist on "over a thousand" cases and had testified as an expert "well over a hundred times."  (Id. at 267.)

Dr. Wetli is the Chief Medical Examiner for Suffolk County, New York. (Id. at 328). As of 2003, he held that position for eight-and-a-half years.  (Id.)  Before that, he was the deputy chief medical examiner in Dade County, Florida for fifteen years.  (Id.)  He is certified by the American Board of Pathology, Anatomical and Clinical and Forensic Pathology.  (Id.)

As noted above, Dr. De Forest explained that the blood spatter patterns indicated that the victim's body may have been moved before it was found, and that the patterns were inconsistent with the perpetrator being in the male missionary position and raping the victim at the time of the attack.  Dr. De Forest further explained that both the defensive wounds and the fluid which was found in the victim's vaginal vault were inconclusive as to whether a rape, as opposed to consensual sex, had occurred, and he called attention to Dr. Callery's failure to measure or test the purported seminal fluid found in the victim's vagina.  Dr. Wetli pointed out that the lack of evidence of strangulation and trauma to the genital area were also indicators that there was no rape.  Consultation with experts of similar ilk would have undoubtedly, at a minimum, aided trial counsel in cross examination preparation.

In short, given the availability and potential effectiveness of forensic experts, trial counsel did not have a reasonable basis when he chose not to investigate the rape charge or consult with an expert.  This omission is particularly egregious considering that this issue established the sole aggravating factor leading to Petitioner's death sentence.  Nevertheless, the Pennsylvania Supreme Court's determination that counsel's performance was reasonable will stand so long as its decision was not "contrary to" or an "unreasonable application" of Strickland and its progeny.   Indeed, a state court's determination that a claim lacks merit precludes federal

habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Harrington, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

### d.    The Pennsylvania Supreme Court PCRA Opinion

In its PCRA opinion, the Pennsylvania Supreme Court addressed the question of whether "trial counsel was ineffective for failing to investigate and present expert testimony to rebut the Commonwealth's assertion that the victim was raped." Miller II, 987 A.2d at 652. While the court did note how the testimony of Drs. De Forest and Wetli undermined the testimony of Dr. Callery, it never addressed the prejudice prong of Strickland. Rather, the court focused on the performance prong of Strickland, basing its decision on the content of trial counsel's testimony at the PCRA hearing. The court summarized trial counsel's testimony as follows:

> Trial counsel testified that based on his experience, he believed that it was not necessary to consult an expert to rebut the evidence that a rape occurred because he did not think that Dr. Callery would be found credible. N.T. 10/27/03, 85-87. Although counsel could not recall what he did in preparing to cross-examine Dr. Callery, he recalled he did take steps to discredit his testimony.
>
> []Trial counsel testified that he did not seek out and retain an expert because his review of the evidence made it pellucidly clear to him that no rape occurred and that it was his belief that anyone who reviewed the evidence would draw the same conclusion he did. N.T. 10/27/03, 85-86. Trial counsel also related that it was his belief that he could rebut and undermine the testimony of Dr. Callery, the Commonwealth's expert witness, with respect to whether a rape occurred without the assistance of an expert witness through skillful cross-examination of Dr. Callery. N.T. 10/27/03, 87. Counsel drew this conclusion from his cross-examination of Dr. Callery at a pre-trial hearing during which he extensively cross-examined the doctor and elicited from him several inconsistencies with respect to whether the doctor was of the opinion, to a reasonable degree of medical certainty, that the murder and the sexual intercourse occurred simultaneously.

Id. at 653.

The court then moved to its legal conclusion.  The <u>entire</u> portion of the opinion analyzing counsel's choice not to seek out an expert witness is reprinted in full below.

> On the basis of trial counsel's testimony, we cannot say that the PCRA court erred in concluding that trial counsel had a reasonable basis for not seeking out an expert witness to rebut Dr. Callery's testimony.  This Court's review of matters involving trial strategy is deferential. Trial counsel will be deemed to have acted reasonably if the course chosen by trial counsel had some reasonable basis designed to effectuate his client's interests. <u>Commonwealth v. Puksar</u>, 597 Pa. 240, 951 A.2d 267, 277 (2008).  Moreover, a claim of ineffectiveness will not succeed by comparing, in hindsight, the trial strategy trial counsel actually employed with the alternatives foregone.  <u>Id.</u>  Finally, "[a]lthough we do not disregard completely the reasonableness of other alternatives available to counsel, 'the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis.'" <u>Commonwealth v. Cooper</u>, 596 Pa. 119, 941 A.2d 655 (2007) (quoting <u>Commonwealth v. Pierce</u>, 515 Pa. 153, 527 A.2d 973, 975 (1987)).

> Since the record supports the PCRA court's finding that trial counsel had a reasonable basis for not consulting with an expert witness, Appellant is denied relief with respect to this claim.

<u>Id.</u>

### e. The Unreasonable Application of <u>Strickland</u>

Even applying the greatest deference, I cannot find any support for the Pennsylvania Supreme Court's conclusions.  As set forth above, the court notes that counsel believed Dr. Callery would not be found credible, but cites not one reason why this conclusion is reasonable. The court points to the fact that counsel indicated that he did take steps to discredit Dr. Callery's opinion, yet no "steps" are mentioned.  The court also cites to counsel's belief that he could discredit Dr. Callery "through skillful cross examination," yet a review of that cross examination belies that conclusion.  The court refers to opportunities noted by counsel to create inconsistencies in Dr. Callery's testimony, but counsel never attempted to establish these inconsistencies at trial.

In short, without any basis or substantial reference to the trial or PCRA record, the court simply states that counsel's performance was reasonable.  After careful consideration, I can find no reason – strategic or otherwise – to support trial counsel's failure to consult an expert about Petitioner's rape charge.  I therefore conclude that the Pennsylvania Supreme Court's decision was an unreasonable application of clearly established federal law.

Because I conclude that the court's application of federal law was unreasonable, I must also evaluate the prejudice prong of Strickland. In its opinion on PCRA appeal, the Pennsylvania Supreme Court limited its analysis to the deficient performance prong and did not address prejudice.  My review of the prejudice prong of Strickland is therefore de novo.  Appel, 250 F.3d at 210.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  Strickland, 466 U.S. at 691–92.  Thus, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance."  Id.  In order to succeed on an ineffective assistance of counsel claim "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id. at 687.

A court addressing an ineffective assistance claim should examine the "totality of evidence at trial" noting that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  Id. at 695–96.  This standard is not "a stringent one" and is "less demanding than the preponderance

standard." Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001). Thus, the question before me is whether there was a reasonable probability that consulting with and possibly presenting a forensic expert would have altered the outcome in Petitioner's trial as it relates to the rape conviction and the finding that the rape was the aggravating factor which supported the death sentence.

Dr. Callery's testimony was the only evidence establishing the aggravating factor that resulted in the death sentence. As such, this appears to be a situation where the "totality of the evidence" was "weakly supported by the record," and thus the resulting sentence was more likely attributable to counsel's errors. As noted several times now, both Dr. De Forest and Dr. Wetli offered sound opinions which undermined the basis of Dr. Callery's testimony. Had counsel performed competently and consulted with a forensic expert before trial, he would have raised questions about Dr. Callery's theory. Counsel could have also presented the testimony of an expert at trial to directly rebut Dr. Callery's opinion.

Had these glaring deficiencies been addressed, there is a reasonable probability that the rape result would have been different, and Petitioner would not have been sentenced to death. Petitioner is therefore entitled to habeas relief on his rape conviction and death sentence.

### 3. Claim III: Was Petitioner's Counsel Ineffective for Failing to Object to the Testimony of Dr. Callery About the Occurrence of Rape on the Grounds That This Opinion Fell Below the Required Standard of Proof, and for Failing to Raise This Issue on Appeal?

Petitioner also contends that counsel's performance was deficient for failing to object to the testimony of Dr. Callery because his opinion fell below the required level of certainty, and for failing to raise this issue on appeal. Petitioner argues that, had counsel objected, there is a reasonable probability that Dr. Callery's testimony would have been excluded, he would not have been convicted of rape, and in the absence of a rape conviction – the sole aggravating factor

leading to the death sentence – he would have been ineligible for a sentence of death.  (Br. at 40–45.)

In Pennsylvania, "[a] medical opinion is sufficient to support a finding when given with a reasonable degree of medical certainty."  Commonwealth v. Edmiston, 634 A.2d 1078, 1084 (Pa. 1993) (citing Commonwealth v. Stoltzfus, 337 A.2d 873 (Pa. 1975)).  At the pretrial hearing, Dr. Callery testified that it was his "opinion to [a] reasonable degree of medical certainty that intercourse was taking place while [the victim] was being stabbed."  (N.T. 09/08/97 at 39.)  At trial, however, Dr. Callery did not testify to the occurrence of rape to a reasonable degree of medical certainty.  While trial counsel did not object to the testimony, he did indirectly reference Dr. Callery's omission in his closing argument, stating that "[Dr. Callery's] opinion was not testified to beyond a reasonable degree of medical certainty and I think that lessens his testimony."  (N.T. 10/01/97 at 269.)

 In its opinion on PCRA appeal, the Pennsylvania Supreme Court concluded that it was a reasonable trial strategy not to object to Dr. Callery's opinion on the grounds that the opinion fell below the required level of certainty so that counsel could argue in closing argument that the testimony was entitled to less weight.  The court stated:

> Trial counsel testified [at the PCRA evidentiary hearing] that he did not proffer an objection to Dr. Callery's testimony because three weeks prior to Dr. Callery's taking of the witness stand, Dr. Callery testified during a pre-trial hearing that it was his opinion that a rape occurred and that if he proffered an objection, the Commonwealth would have been permitted to elicit the necessary testimony from the doctor.  In addition, trial counsel testified that he did not object, and give the Commonwealth an opportunity to elicit from Dr. Callery the "magic words" because he made the tactical decision to use that omission to argue to the trial court that no rape occurred.

> The PCRA Court ruled that this ineffectiveness claim lacked merit because trial counsel had a reasonable basis for failing to object. PCRA Court's Opinion, 11/2/07, 30-31.  We agree. Counsel was correct in surmising that an objection likely would have resulted in the Commonwealth seeking and being granted

permission to elicit from Dr. Callery his opinion that a rape had occurred herein given that the doctor had offered that opinion prior to trial.  Thus, had trial counsel proffered an objection, his strategy to use the omission to argue that there had been no rape would have been negated by the anticipated opinion testimony of Dr. Callery that the victim had been raped.  Trial counsel's strategy was reasonable given that had the trial court determined that Dr. Callery's opinion testimony was insufficient to establish a rape because the doctor did not utter the "magic words," as trial counsel argued, the Commonwealth would have been without a viable aggravating circumstance.  Accordingly, because trial counsel had a reasonable basis for not objecting here, Appellant's claim with respect to this issue was properly denied by the PCRA court.

Miller II, 987 A.2d at 656–57.

Petitioner contends that the court's conclusion that this strategy was constitutionally competent was an unreasonable application of federal law.  Like the previous claim, this argument is premised on counsel's failure to undertake a sufficient investigation into the rape charge and consult with any forensic experts, including Dr. Callery.  Petitioner posits that, given the lack of investigation, counsel's strategic decision not to object to Dr. Callery's testimony is not entitled to deference, and had counsel consulted with Dr. Callery or other experts, he would have known that he could have objected to the testimony as failing to rise to the required level of certainty.

Though I found that trial counsel's effectiveness regarding Dr. Callery was constitutionally deficient, I do not agree with Petitioner that this conclusion is dispositive of counsel's alleged ineffectiveness for failing to object to Dr. Callery's testimony regarding the "magic words."  While counsel's lack of preparation regarding Callery was indeed troubling, Petitioner has not made the connection between that lack of preparation and counsel's failure to object to Callery's opinions.  As the Pennsylvania Supreme Court noted, trial counsel was fully aware that Dr. Callery did not testify to the occurrence of rape to a "reasonable degree of medical certainty," and tactically took advantage of this omission by arguing in closing argument that Dr.

Callery's opinion should be entitled to less weight. As such, the Supreme Court's conclusion that counsel's strategy here was constitutionally competent was a reasonable application of Strickland.

Even if I were to have found that the Supreme Court unreasonably applied Strickland as it relates to the performance prong of this claim, in order to warrant relief, Petitioner would still have to show that he was prejudiced by counsel's performance. Specifically, Petitioner would have to establish that there was a reasonable probability that Dr. Callery's testimony would have been excluded had trial counsel objected to his testimony as falling below the required standard of proof.

In this regard, Petitioner points to an affidavit signed by Dr. Callery on January 26, 2005, seven years after the trial, where he stated that the evidence was "plainly consistent with any of the following scenarios: that intercourse occurred before Ms. Miller was killed and then she was killed; that intercourse occurred while she was being stabbed; or that intercourse occurred after she had been killed." Callery continued that "[b]ecause of the number of plausible scenarios, I do not hold the opinion to a reasonable degree of medical certainty that [the victim] was killed while the assailant was engaging in sexual intercourse with her. To the extent that my testimony in this case appears to conflict with any of these conclusions, my actual opinion at the time of the trial is stated in the affidavit." Dr. Callery concluded his affidavit by stating that if trial counsel had interviewed him before he testified, he would have "told him the things I say in this affidavit and testified to them on the witness stand." (App. to Br. at A18–19.)

The Pennsylvania Supreme Court considered Petitioner's arguments about the effect of Dr. Callery's affidavit. The court concluded that Petitioner was not prejudiced by counsel's failure to object to Dr. Callery's testimony because Petitioner's "argument amounts to nothing

more than mere speculation.  There is no indication in the record that Dr. Callery would have advised trial counsel before the trial commenced that it was his belief that no rape occurred if only trial counsel had interviewed him."  Miller II, 987 A.2d at 659.  Petitioner argues that this amounts to an unreasonable factual determination since "Dr. Callery's own words [in the affidavit] directly contradict this statement."  (Reply at 26.)

Petitioner's focus on the inconsistency between Dr. Callery's affidavit and his trial testimony is certainly understandable, and Dr. Callery's complete about-face regarding his opinions is curious to say the least.  I do not, however, find the Pennsylvania Supreme Court's characterization of this claim as being based on "speculation" to be unreasonable.  Dr. Callery's affidavit, signed seven years after the trial, does not address in any detail the evidence he considered (or reconsidered) and more significantly does not adequately explain his change of opinion from the pretrial hearing (where he testified to a reasonable degree of medical certainty that a rape occurred during the commission of the homicide), the trial, and the affidavit.  Thus, even if counsel's representation was objectively unreasonable, Petitioner cannot show that there was a reasonable probability that Dr. Callery's testimony would have been excluded had counsel objected.  Consequently, Petitioner is due no relief on this claim.[7]

---

[7] Notwithstanding this conclusion, I note that Dr. Callery's affidavit serves only to bolster my previous finding that counsel was ineffective for failing to adequately investigate, prepare, or present testimony to rebut the Commonwealth's rape allegation.  Dr. Callery's trial testimony that the rape was committed during the commission of the homicide formed the sole basis for the death sentence.  His concession in the affidavit that the evidence was also consistent with sexual intercourse having occurred either before or after the homicide – both of which would not constitute an aggravating circumstance for purposes of Pennsylvania's death penalty statute – underscores the egregiousness of counsel's failure to consult with and possibly present an expert to rebut Dr. Callery's testimony.

**4.      Claim IV: Did the Commonwealth Withhold Favorable and Exculpatory Evidence Relating to Commonwealth Witness Michael Torres in Violation of <u>Brady v. Maryland</u>, and Was Petitioner's Counsel Ineffective for Failing to Properly Investigate, Develop, and Present Evidence Discrediting This Witness?**

Petitioner contends that his right to due process was violated under <u>Brady v. Maryland</u> when the Commonwealth failed to disclose the full background of Commonwealth witness Michael Torres, which contained indications of mental illness.  Petitioner relatedly argues that counsel was ineffective for failing to investigate, develop, and present this exculpatory impeachment evidence of Torres's mental illness.  (Br. at 45–63.)

**a.      Torres's Trial Testimony**

Michael Torres was Petitioner's cellmate in 1995 for about two months at Chester County Prison when Petitioner was imprisoned for aggravated assault against his wife.  (N.T. 09/30/97 at 179).  At trial, Torres testified regarding statements that Petitioner made while they were cellmates.

| | |
|---|---|
| PROSECUTOR: | Can you recall any specific statements [Petitioner] made while you were cellmates concerning his wife? |
| TORRES: | We was talking a couple times and he would like get in a daze and just, you know, say, I'm going to kill my wife. |

(<u>Id.</u> at 180–81.)  Torres testified that Petitioner said this statement "numerous times," (<u>id.</u> at 181), including on the day he was released from prison.

| | |
|---|---|
| PROSECUTOR: | Can you recall having any conversations with him on the day that he left? |
| TORRES: | Yeah. |
| PROSECUTOR: | Tell us about that. |
| TORRES: | Well, we was just talking about what he had |

> to do when he got out and, you know, right
> before he left out the cell he looked at me
> and he said, I'll be back for killing my wife.

(Id. at 183.)  In his closing argument, the prosecutor stressed the importance of this testimony.

> It's important that Your Honor should consider the testimony of
> Michael Torres, that the defendant obsesses about his wife when
> he was in prison; that the defendant was aware of his anger and his
> rage and all of the feelings that he had within him which made him
> want to kill her.

(N.T. 10/01/97 at 273.)

On cross examination, which is set forth below in full, trial counsel questioned Torres on

the convictions for which he was serving time when he was Petitioner's cellmate.

| | |
|---|---|
| TRIAL COUNSEL: | Mr. Torres, you were in prison that time for terroristic threats and dealing heroin? |
| TORRES: | Yeah. |
| TRIAL COUNSEL: | What are you in jail for now? |
| TORRES: | The same thing.  I never got out. |
| TRIAL COUNSEL: | Now, you said that [Petitioner] told you numerous times that he was going to kill his wife when you were at the prison.  Who else was around when he said this? |
| TORRES: | I can't recall. |
| TRIAL COUNSEL: | Other people? |
| TORRES: | There might have been. |
| TRIAL COUNSEL: | I have nothing [] else. |

(Id. at 184.)

In addition to this cross examination, trial counsel called Eric Blevins to discredit

Torres's testimony.  Blevins was also serving a sentence at the Chester County Prison and met

48

Petitioner and Torres while working in the prison laundry.  (N.T. 10/01/97 at 233.)  Blevins's

testimony centered around a conversation that he had with Torres after Petitioner was released

from prison and the murder occurred.  Blevins testified:

> Michael Torres told me he wanted to know a way to get out of prison.  And then
> he remembered about reading something about Dennis Miller in the paper about
> killing somebody or something like that.  So he said he was going to use Dennis
> to get out of prison.  He told Officer Lattanzio to call the detectives' agency or the
> state police where he could talk to them.

(Id. at 234.)  Blevins then continued that "[Torres] was trying to use Dennis to get out of jail.

[Torres] was looking at a state sentence or something like that.  And he wanted to get out and

he's using Dennis like a scapegoat."  (Id.)

### b.    Torres's Criminal and Medical Records

Torres's criminal and incarceration records contain indications of both mental illness and

criminal convictions beyond those for which he was imprisoned while he was Petitioner's

cellmate.  With respect to mental illness, Torres's Northampton County docket contains a March

7, 1994 entry noting that he was "in Norristown State Hospital and Unavailable for Trial," and a

June 15, 1994 Presentence Report for Northampton County states that "[i]t should also be noted

that [Torres] has spent time at the Norristown State Hospital."  (Appx. to Br. at A49, A97.)  His

Norristown State Hospital records – which are included in his Chester Country Prison records –

contain a April 11, 1994 notation by a staff psychiatrist that "[Torres] admitted hearing voices

telling him to kill himself; stated he sees the shadow of 'people moving around him' . . . [and]

admitted to both visual/auditory hallucinations."  (Id. at A130–31.)  Medical notes from Chester

County Prison relate similar symptoms.  An August 1, 1995 progress note states Torres was "still

[experiencing] episodic voices of his girlfriend telling [him] to kill himself + others"; an October

3, 1995 note states Torres "still c[omplains] o[f] hearing voices"; and a November 8, 1995 note

states Torres "[a]dmits to voices telling him to harm himself; he told us his celly killed his wife; he was interrogated by the police + feels very confused + overwhelmed."  (Id. at A114.)

With respect to his criminal convictions, Torres's docket from Northampton County includes convictions for a theft charge and an unsworn falsification to authorities charge, for which he was sentenced on September 28, 1990.  (Id. at A76, A80.)

### c.        PCRA Hearing

At the PCRA hearing, Petitioner's PCRA counsel questioned trial counsel about his strategy to discredit Torres's testimony.  Trial counsel testified that he neither interviewed Torres nor tried to obtain his prison records, and did not have any tactical or strategic reason for not doing so.  Trial counsel, however, defended his trial strategy by saying that he "had a witness who said [Torres] was lying . . . [and] felt that was sufficient."  (N.T. 10/27/03 at 23–24.)

Torres also testified at the PCRA hearing, and stated that he had psychiatric problems his whole life and hears voices.  He confirmed that during the time he was Petitioner's cellmate he was hearing voices, was taking anti-psychotic medications, but did not tell Petitioner of his psychiatric problems.  Torres stated that it was not until after the trial that he began to wonder about whether Petitioner really told him that he was going to kill his wife.  He said that "I don't know if [Petitioner] told me that he was going to kill his wife . . . [b]ecause I hear it in my head, and so many people say it all the time in prison and out of prison."  (N.T. 10/28/03 at 219–26.)

### d.        The **Brady** and Ineffectiveness Claim

It is well established "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment."  Brady v. Maryland, 373 U.S. 83, 87 (1963).  To meet the Brady standard, "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;

that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Banks v. Dretke, 540 U.S. 668, 691 (2004) (quoting Strickler v. Greene, 527 U.S. 263, 281–82 (1999)).

Here, the prosecution did not provide trial counsel with Torres's criminal or medical records, and it is uncontroverted that these records could have been used to impeach his testimony and are thus favorable to Petitioner.  For purposes of the Brady claim, the issue is whether these records were material insofar as Petitioner was prejudiced by the nondisclosure. As for the related ineffectiveness claim, the parties dispute whether Petitioner was prejudiced by counsel's failure to locate and use the records at issue to impeach Torres.  Because the materiality standard under Brady and the prejudice standard under Strickland are essentially the same, I will address both of these related claims together.  United States v. Bagley, 473 U.S. 667, 682–83 (1985) (adopting the Strickland "reasonable probability" that "the result of the proceeding would have been different" as the appropriate standard for Brady materiality).

The Pennsylvania Supreme Court addressed the issue of whether Petitioner was prejudiced by counsel's failure to use Torres's criminal and incarceration records to impeach him.  The court first stated:

> [T]he claim does not entitle Appellant to relief because he has not met his burden of establishing that he suffered prejudice because of trial counsel's alleged nonfeasance.  According to Appellant, he was prejudiced by trial counsel's failure to investigate Torres because Torres's testimony "was critical to establishing the specific intent element of first-degree murder as [t]here was little else in the case that pointed to any kind of deliberation or premeditation of any kind."  Appellant is mistaken.  In addition to the use of a deadly weapon on vital parts of the victim's body, [FN9] Appellant left the incriminating note wherein he admitted that he killed the victim willfully.  Thus, Torres's testimony was not as critical as Appellant claims it was with respect to proof that he acted with specific intent to kill.
>
> FN9: The law is clear that specific intent to kill may be inferred from the use of a deadly weapon on a vital part of another person's body.  Commonwealth v.

51

Wright, 961 A.2d 119, 130 (2008); Commonwealth v. Kennedy, 959 A.2d 916, 921 (2008).

Miller II, 987 A.2d at 654–55.

Petitioner contends that the court's analysis "of the prejudice prong is an unreasonable determination of the facts, as well as an unreasonable application of federal law, because it confuses evidence of specific intent and premeditation."  He stresses that because "counsel's theory of defense was that Petitioner committed voluntary manslaughter, which supposes specific intent, but not malice or premeditation," the critical inquiry is not, as the state court framed it, whether the use of a deadly weapon and an incriminating note was critical to establishing specific intent, but rather whether it was critical to establishing malice or premeditation for the purposes of first degree murder.  (Br. at 62.)

Petitioner is correct that the Pennsylvania Supreme Court decision does not clearly delineate between specific intent and malice.  The state court did, however, correctly characterize Petitioner's use of a deadly weapon, and it is undisputed that the autopsy revealed that the victim died as a result of more than thirty stab wounds to her head, neck, chest, arms, and hands.  Under Pennsylvania law, "[i]t is well settled that specific intent to kill, as well as malice, may be inferred from the use of a deadly weapon upon a vital part of the victim's body."  Commonwealth v. Gardner, 416 A.2d 1007, 1008 (Pa. 1980).  Given the weight of the physical evidence against Petitioner, it was certainly reasonable for the court to conclude that Torres's testimony was not critical to finding that Petitioner's crime met the elements of first degree murder.  Petitioner's ineffectiveness argument here therefore fails.

In addition to finding that Torres's testimony was not critical to the first degree murder conviction, the Pennsylvania Supreme Court also found that Petitioner was not prejudiced by his counsel's failure to uncover and use Torres's criminal and medical records.  The court held that

"trial counsel effectively undermined Torres's testimony by presenting the testimony of a witness who stated that Torres admitted he was going to lie about what Appellant may have said to him in order to help himself." Miller II, 987 A.2d at 655.  Petitioner contends that this analysis was unreasonable because the court "failed to consider the effect of the totality of the impeachment of Torres—that conducted at trial through Blevins, *plus* the available impeachment through his *crimen falsi* convictions and mental health impairments." (Br. at 62–63) (emphasis in original.)

The court's analysis here was not unreasonable.  Blevins indeed testified that Torres told him simply that "he was going to use [Petitioner] to get out of jail." (N.T. 10/01/97 at 234.) While the use of Torres's criminal and medical records may have further undermined Torres's testimony, it was not unreasonable for the court to characterize Blevins's testimony as rebutting Torres's testimony.

Because the court reasonably concluded that Torres's testimony was not critical to the first degree murder conviction and, in any event, was effectively undermined by Blevins's testimony, Petitioner was not prejudiced within the meaning of Strickland by his counsel's failure to use the criminal and medical records to impeach Torres, nor were those records "material" within the meaning of Brady.[8]  Accordingly, Petitioner is due no relief on this Brady and related ineffectiveness claim.

### 5.   Claim V:  Was Petitioner's Counsel Ineffective at Capital Sentencing for Failing to Conduct Any Meaningful Investigation Regarding Mitigation Evidence?

Petitioner contends that counsel was ineffective for failing to investigate, develop, and

---

[8] Having found that the state court's determination that Petitioner was not prejudiced by the nondisclosure of the criminal and medical records at issue was reasonable, I need not discuss the issue of whether the prosecution had a duty under Brady to provide these records to trial counsel.

present additional mitigating evidence regarding his childhood, family relationships, mental health, drug abuse, and brain damage during the penalty phase of the trial.  He claims that had this evidence been presented, a reasonable factfinder would have accorded more weight to the Section 9711(e)(3) mitigating factor that the trial judge did find ("the capacity of the defendant to conform his conduct to the requirements of law was substantially impaired"), and would also have found that the catch-all mitigating circumstance under Section 9711(e)(8) was present. Petitioner argues that with this additional evidence there is a reasonable probability that he would have been sentenced to life imprisonment because the mitigating circumstances would have outweighed the aggravating circumstance of rape during the commission of the homicide.  (Br. at 64–89.)

### a.    The Penalty Hearing

The prosecutor began the penalty hearing stating that the Commonwealth intended to "present evidence regarding both of the aggravating circumstances [torture and rape] which [it] had set forth originally in the criminal information."  To that end, and "in order to establish a factual basis for the finding of torture . . . as an aggravating circumstance," the Commonwealth moved to incorporate the trial testimony into the penalty phase proceeding.  "With respect to the other charge, that this was murder committed during the perpetration of another felony, [the Commonwealth] rest[ed] on [the court's] verdict of guilty on the charge of rape."  After the trial testimony and the rape verdict were incorporated into the penalty phase proceeding, the prosecutor presented brief victim impact testimony from Barbara Miller, the daughter of Petitioner and the victim.[9]  (N.T. 10/02/97 at 286–90.)

Petitioner then presented the testimony of four witnesses: Dr. Gerald Cooke, a clinical

---

[9] The admissibility of that testimony will be discussed in Claim VII.

and forensic psychologist; Kenneth Miller, Petitioner's brother; Deborah Miller, Petitioner's sister; and Agnes Miller, Petitioner's mother.  (Id. at 292–324.)

Dr. Cooke testified that he evaluated Petitioner on August 14, 1997, starting with a personal history, and performed a battery of tests.  Dr. Cooke also reviewed the criminal complaint, the affidavit of probable cause, the autopsy and toxicology reports on the victim, and the police investigation reports.  Petitioner described to Dr. Cooke how "his father was an alcoholic and abusive to his mother," and how "he would often try to get between them to protect his mother."  Petitioner chronicled his substance abuse history, relating that by the age of 15, he was drinking alcohol and injecting methamphetamine regularly, and "except for the times in jail or rehabs, since 1994 he had been injecting heroin regularly and snorting methamphetamine occasionally."  With respect to the crime itself, Dr. Cooke stated that Petitioner told him that "he went into a rage and grabbed a knife that was by the side of the bed" after the victim told him, just after they had sex, "that she wanted him to move out the next day and was moving her boyfriend Sean in."  Dr. Cooke also went through Petitioner's criminal history with him and stated that Petitioner was sentenced to prison twice for having "put a gun to his wife's head," and that he had gotten out of jail just two months before the murder.  (Id. at 293–302.)

Dr. Cooke estimated that Petitioner's IQ score was "between 81 and 89, which is low average."  The doctor testified that tests indicated that Petitioner "is an angry man and when frustrated he can explode," and that "he can go into rages particularly when he's disinhibited by alcohol and drugs."  Dr. Cooke stated that he found no evidence of a psychotic or thinking disorder, and diagnosed Petitioner with (1) paranoid personality disorder with antisocial and explosive features; (2) a history of drug dependence; and (3) a history of alcohol dependence. (Id. at 303–05.)  When asked by defense counsel about the conclusions he reached as to

mitigating circumstances, Dr. Cooke stated:

> I think his personality dynamics are consistent with the fact that this is a man, who particularly when he is rejected by someone important to him as his wife, that this would be something that would trigger an explosive rage. And it's my opinion in the context of such an explosive rage he would show a significant impairment in his ability to conform his behavior to the requirements of law. And it's my opinion that those diagnoses and his history and the personality dynamics would be consistent with that kind of problem, which, my understanding, is part of the mitigating factors.

(Id. at 306.)

Kenneth Miller, Petitioner's brother, Deborah Miller, Petitioner's sister, and Agnes Miller, Petitioner's mother, all testified briefly and were asked to speak about Petitioner's good qualities. Kenneth Miller testified that there were good times between Petitioner and the victim, that Petitioner "was [l]ike a typical father" to his children, and that if Petitioner were sentenced to death, it would negatively affect his family. (Id. at 317–20.) Deborah Miller testified that Petitioner was "a family oriented person," that the relationship between Petitioner, the victim, and their children seemed good, and that, when Petitioner had been released from prison, "[h]e wanted that closeness and that loving, loving and caring as a family again." (Id. at 321–22.) Agnes Miller relayed that Petitioner was a hard working person, that he loved his children, and that it would not help the problems the children were having after their mother died for their father to be sentenced to death. (Id. at 323–24.) In addition, Agnes Miller's trial testimony was incorporated into the penalty phase hearing. At trial, Agnes Miller testified that while Petitioner and the victim "ha[d] a good marriage [] at the start," the marriage deteriorated because "both of them had a problem with drugs . . . and drinking." (N.T. 09/29/97 at 30.)

At the end of the penalty phase hearing, the trial judge sentenced Petitioner to death. (N.T. 10/02/97 at 341.) With respect to the aggravating and mitigating circumstances, the trial judge explained:

56

The findings on which the sentence of death is based are, one or more aggravating circumstances which outweigh any mitigating circumstances. The aggravating circumstance is that the defendant committed a killing while in perpetration of a felony, in this case the rape. The mitigating circumstance that I found was the capacity of the defendant to conform his conduct to the requirements of law was substantially impaired.

However, I found that the aggravating circumstance, after a very careful deliberation, outweighed the mitigating circumstance, and, therefore, felt obligated to impose the sentence of death.

(Id.)

### b. PCRA Hearing

### i. Family Members' Testimony

At the PCRA evidentiary hearing, Petitioner presented the testimony of several family members and experts. The family members included his mother, Agnes Miller, his brother Kenneth Miller, and his daughter, Barbara Miller, all of whom had testified during the penalty phase of the trial. In addition, Brenda Miller, Linda Drew, and Glenna Saganich, Petitioner's sisters, and Helen Pennington, the victim's sister, testified.

The family members' testimony centered around Petitioner's childhood and his relationship with the victim. Agnes Miller explained that her husband, Petitioner's father, was an alcoholic and used to beat her "about every time he was drunk." She stated that the beatings became worse when Petitioner was about seven or eight years old, and when Petitioner was about nine or ten, he started getting in between her and her husband to try to stop him from hitting her. Agnes Miller stated that Petitioner became "angry about it because he wanted him to quit beating on me." She said that her husband would also hit Petitioner, and that her husband once threw a cinderblock at Petitioner. She also said that there were problems with the marriage between Petitioner and the victim, but that trial counsel did not ask her about any of the childhood abuse or the marital problems before she testified at the penalty phase. (N.T. 10/28/03

at 355-75.)

Kenneth Miller, Petitioner's older brother, testified that Petitioner and he grew up in poverty in a home headed by a "raging alcoholic that was both mentally and physically abusive." He stated that he saw "black eyes, split lips, bruises" on his mother as a result of his father's beatings, but that the police were unresponsive, he and Petitioner "couldn't stop it," and that their father would hit them with a "closed fist" when they "tried to get in the middle." Kenneth Miller stated that he and Petitioner started doing drugs with each other, when he was 15 and Petitioner was 13, starting with marijuana and alcohol, then moving to LSD and methamphetamine. By the time Petitioner was 15 and he was 17, they were staying up all weekend using methamphetamine. With respect to Petitioner's marriage with the victim, Kenneth Miller explained that they started selling drugs so they could do drugs themselves, and that, because of the drug use, "[t]hey grew away from the family." Kenneth Miller further stated that, prior to testifying at the penalty phase, trial counsel did not ask him about Petitioner's childhood or drug use, but that he would have been willing to testify to that if asked. He stated that trial counsel did not even interview him, but instead spoke with him "[o]nly right outside the courtroom, right before he asked anyone who wanted to go in who could say something positive." (Id. at 482–501.)

Petitioner's sisters, Glenna Saganich, Brenda Miller, and Linda Drew each reiterated much of what Kenneth and Agnes Miller testified to about the abusive home in which Petitioner grew up. They also stated that Petitioner's lawyer never interviewed them about Petitioner's childhood, but had they been asked, they would have testified about it. (N.T. 10/29/03 at 415–33, 470–80, 586–90.) Helen Pennington, the victim's sister, testified to the relationship between Petitioner and the victim. She stated that Petitioner and the victim both used and sold drugs, and

that she took her sister to get an abortion after she was impregnated by Larry Brown.[10]  She also stated that she would have been willing to testify to all of this had she been asked to do so at the time of trial.  (Id. at 508–20.)

Barbara Miller, the daughter of Petitioner and the victim, testified about her parents and their relationship.  She stated that while her early childhood was a "normal, nice life," her parents started having problems as she got older.  She testified that they would fight about money and drugs, and that her parents broke up a few times.  She further stated that while she was angry at her father at the time of trial, she would have testified at the penalty phase on Petitioner's behalf had she been asked to do so.  (N.T. 10/28/03 at 376–93; N.T. 10/29/03 at 397–41.)

### ii.    Expert Testimony

Petitioner called two experts at the PCRA hearing for purposes of establishing that trial counsel was ineffective in preparing for the penalty hearing.  Dr. Carol Armstrong, a neuropsychologist, testified that she examined Petitioner. She stated that the neuropsychological tests she performed, which were available at the time of the trial, revealed that Petitioner was brain damaged and "did not have normal brain function in some areas," particularly in the areas of motor control, visual attention, and verbal fluency.  She explained that these impairments affected Petitioner's abilities, cognitivity, reasoning, and judgment.   Dr. Armstrong also examined Dr. Cooke's report from the penalty phase, and was asked whether anything in the report "would have raised a red flag [] as to the possibility of brain damage of something that would have been consistent with brain damage."  Dr. Armstrong pointed to the "chronically abusive situation in the home," the "flat, semi-skilled occupational history,"  the "extensive drug

---

[10] Larry Brown was mentioned in the note which was recovered at the house after the murder.

and alcohol use," the references to "poorly controlled anger and his tendency to decompensate under stress and drug use," and "[Petitioner's] IQ being at the low end of normal."  Dr. Armstrong then concluded, to a reasonable degree of neuropsychological certainty, that Petitioner's impairment constituted an extreme mental or emotional disturbance and that he had a substantially impaired capacity to conform his conduct to the requirements of the law.  (N.T. 10/27/03 at 121–29.)

Dr. Julie Kessel, a psychiatrist who also examined Petitioner, reinforced Dr. Armstrong's testimony.  She stated that she reviewed Petitioner's school records, court documents, protection from abuse documents, drug rehabilitation records, Dr. Cooke's report for the penalty phase, and Dr. Armstrong's report for the PCRA hearing.  Dr. Kessel opined that Petitioner's family background, substance abuse, and medical records regarding a motorcycle accident he was in as a teenager were all indications that Petitioner suffered from organic brain damage. (N.T. 10/29/03 at 521–50.)

### iii.     Trial Counsel's Testimony

At the PCRA hearing, trial counsel was questioned about his preparation for the penalty phase hearing.  He testified that, before the hearing, he "had a lot of conversations" with Petitioner's sister Kay and his mother Agnes Miller, and, while he could not recall exactly what he interviewed them about, he knew "that one of the things [he] specifically focused with them on was the initial entry into the home when the body was discovered."  Counsel testified that he also spoke with Petitioner's brother, Kenneth Miller, before he called him as a witness at the penalty phase hearing, but "[p]robably [did so] in the courthouse before he testified."  He stated that he did not try to get Petitioner's medical records because, based on the fact that he "knew the history[,] . . . knew the family," and had a "good relationship" with Petitioner, he believed

that he had "everything that [he] needed."  He testified that he did not call Barbara Miller (the couple's daughter) since she was a young child and because he did not believe, after talking with family members, that she would provide any beneficial information.  (Id. at 25–30.)   With respect to the other family member witnesses who testified at the PCRA hearing, trial counsel did not give any other reason for not seeking out and interviewing them besides for the fact that he felt as though he had sufficient information.  (Id.)

Regarding why he did not have Petitioner tested by a neuropsychologist for brain damage when he was aware Petitioner had abused drugs, trial counsel stated he "had nothing that would have given [him] any indication that Petitioner had any organic brain damage."  Trial counsel stated that he based this decision upon his conversations and interactions with Petitioner and his conversations with the family, along with Dr. Cooke's report which found that Petitioner did not suffer from a thinking disorder, psychoses, or other affective disorders.  (Id. at 40–63.)

### c.   Pennsylvania Supreme Court PCRA Decision

In considering counsel's alleged ineffectiveness in the investigation and preparation of mitigation evidence, the Pennsylvania Supreme Court separately addressed counsel's failure to interview witnesses, obtain Petitioner's school records, medical records, drug use records, and the support order, and have him tested by a neuropsychologist.  Before so doing, the court laid out "[t]he standards applicable to claims alleging that counsel was ineffective for failing to investigate and present mitigating evidence," relying on both Pennsylvania and U.S. Supreme Court cases:

> As this Court has observed, the United States Supreme Court has held that the Sixth Amendment requires capital counsel "to pursue all reasonably available avenues of developing mitigation evidence."  Commonwealth v. Gorby, [] 909 A.2d 775, 790 (2006) (citing Wiggins v. Smith, 539 U.S. 510, 521 [] (2003)). Counsel must exercise reasonable professional judgment, and in examining counsel's conduct, "we focus on whether the investigation supporting counsel's

decision not to introduce mitigating evidence . . . was itself reasonable." Commonwealth v. Malloy, [] 856 A.2d 767, 784 (2004) (quoting Wiggins, 539 U.S. at 523 []).

. . .

Strategic choices made following less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. In undertaking the necessary assessment, reviewing courts are to take all reasonable efforts to avoid the distorting effects of hindsight. See Commonwealth v. Basemore, [] 744 A.2d 717, 735 (2000). Nevertheless, courts must also avoid "*post hoc* rationalization of counsel's conduct." Wiggins, 539 U.S. at 526-27 [].

Miller II, 987 A.2d at 666 (2009) (first quoting Commonwealth v. Nativdad, 938 A.2d 310, 331)

(2007)) (then quoting Commonwealth v. Sattazahn, 952 A.2d 640, 655–56 (2008)).  The court

clarified this point, stating:

Finally, the "reasonableness of a particular investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable attorney to conduct a further investigation." Steele, supra; see also Commonwealth v. Malloy, [] 856 A.2d 767 (2004) (holding that while counsel has a duty to conduct a reasonable investigation, reasonableness of investigation may be dependent on information supplied by the defendant).

Id.

With respect to counsel's failure to interview and present the testimony of the witnesses

who testified at the PCRA hearing, the court concluded that counsel's performance was not

deficient because the testimony "merely would have been cumulative of evidence that was

presented  during a penalty hearing."  Id. at 667 (citing Commonwealth v. Whitney, 708 A.2d

471, 477 (Pa. 1988); Commonwealth v. Abdul-Salaam, 808 A.2d 558, 562 n.5 (Pa. 2001)).  The

Court explained that "[t]rial counsel did investigate evidence of Appellants [sic] childhood

circumstances, marital relationship, and drug abuse, and introduced evidence pertaining thereto

during the penalty hearing."  Specifically, the court noted that "trial counsel introduced through

Dr. Cooke  the witnesses who testified during the penalty hearing, and appellants written

background history and statement concerning Appellant's life history, the abuse Appellant observed and was subject to while growing up, as well as evidence of his drug use." Id. at 666–67.  With respect to the prejudice prong of the ineffectiveness standard, the court found that Petitioner was not prejudiced since "he presented nothing that established that the trial court would have imposed a life sentence if only it had heard additional evidence of [his] childhood, drug dependence, and dysfunctional marital relationship." Id. at 667.

The Pennsylvania Supreme Court then addressed the claim that trial counsel was ineffective for failing to obtain and review the various records.  With respect to the school records which "showed that Appellant had an I.Q. in the high seventies to low eighties and thus was borderline mentally retarded," the court concluded that Dr. Cooke's testimony that Appellant's IQ was in the 81 to 89 range, and the fact that "Appellant was able to hold jobs that required at least a modicum of skills[,] demonstrated that Appellant[']s school records would not have resulted in a different outcome had counsel obtained them and introduced them during the penalty hearing." Id. at 667.  As such, the court concluded that "Appellant has failed to establish that trial counsel acted unreasonably by not obtaining these records. Id.

Regarding medical records relating to the motorcycle accident, the court credited trial counsel's testimony that "he received no information from Appellant or members of his family alerting him to the fact that Appellant had suffered any injury or had medical problems affecting cognition," and also pointed out that "Appellant denied having any significant medical history when examined by Dr. Cooke." Id.  The court accordingly found that counsel's performance could not be deemed deficient in that counsel "cannot be faulted for failing to obtain evidence of which he had no reason to be aware." Id. at 667–68 (collecting cases).

With respect to the records which concerned Petitioner's drug abuse history, the Pennsylvania Supreme Court focused on the cumulative nature of those records, stating that "trial counsel was aware of Appellants substance abuse problem and introduced evidence about it" at the sentencing phase. Id. at 668. Focusing on the prejudice prong, the court concluded that Petitioner was not prejudiced, and that counsel could not be "found ineffective for failing to introduce [cumulative] evidence," the introduction of which would not have changed the outcome of the penalty hearing. Id. Regarding the support order, the Supreme Court found that Petitioner had failed to establish that trial counsel even had knowledge of such an order and therefore could not be deemed ineffective for failing to pursue and present it during the penalty phase. Id.

Lastly, the court addressed the issue of whether trial counsel was ineffective for failing to have Petitioner tested by a neuropsychologist. The Court noted that Dr. Cooke's examination "found no evidence that Appellant 'suffered from a thinking disorder or psychosis or any kind of major affective disorder[] such as major depression or manic disorder," and "neither Appellant nor any member of his family advised trial counsel that Appellant suffered from neurological or mental deficits." Consequently, the court concluded that trial counsel could not be "faulted for not securing additional testing of Appellant." Id. at 668.

### d.    The Ineffectiveness Claim

As recounted above, the Pennsylvania Supreme Court divided its review of this ineffective assistance claim among the various types of mitigation evidence which Petitioner contends trial counsel should have uncovered and presented during sentencing. The court, however, addressed only the prejudice prong of Strickland as it relates to some but not all the pieces of evidence at issue. Petitioner contends that this analysis was unreasonable since the

United States Supreme Court requires a court to "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." Williams v. Taylor, 529 U.S. 362, 397–98. In light of the fact that the state court failed to properly follow this procedure, Petitioner argues that my review of the prejudice prong of Strickland should be de novo. Appel, 250 F.3d 203, 210 (3d Cir. 2001). Respondents do not respond to this argument, instead choosing to focus solely on the reasonableness of the state court's determination on the deficient performance prong of Strickland.

Bearing in mind that the ultimate focus of the ineffectiveness "inquiry [is] on the fundamental fairness of the proceeding whose result is being challenged," I need address only the prejudice prong of Strickland. Id. at 696–97. Accepting Petitioner's argument that my review of the prejudice prong is de novo because the state court did not consider the mitigation evidence in its totality, I conclude that there was not a reasonable probability that the outcome of the sentencing would have been different had Petitioner presented the evidence at sentencing that he presented at the PCRA hearing. Indeed, the penalty phase hearing included testimony from Petitioner's family members who spoke about his drug and relationship problems, and from a doctor who examined Petitioner and concluded that he had a low IQ, paranoid personality disorder, and a history of drug and alcohol abuse. The further lay and expert witness testimony, as well as the support order and the school and drug records which were introduced at the PCRA hearing, were cumulative insofar as this evidence provided further proof of Petitioner's drug, psychological, and marital problems, as opposed to uncovering issues which were not introduced during the penalty phase of the trial. Accordingly, Petitioner is due no relief on this claim.

**6.     Claim VI: Was Petitioner's Waiver of a Jury at Sentencing Invalid, and Was Counsel Ineffective for Failing to Object to the Waiver and for Failing to Raise This Issue on Appeal?**

Petitioner next claims that his death sentence should be vacated and a new sentencing hearing awarded because his waiver of the right to have a jury decide the penalty phase was neither knowing nor intelligent and violated his federal due process rights.  He argues that the trial court's colloquy was deficient because it failed to inform him of the unique procedures of capital jury sentencing, including that a jury's failure to unanimously agree that a death sentence is appropriate would result in a life sentence.  Petitioner also contends that the trial judge misled him when he told him that "you stand the same chance of being sentenced to death or sentenced to life in prison in front of me as you do in front of a jury, as far as I'll decide the matter exactly the same way that a jury will."  Relatedly, Petitioner claims that his counsel was ineffective for failing to object to the inadequate waiver and for failing to raise this issue on appeal.  (Br. at 89–100.)

**a.     The Penalty Phase Jury Waiver Colloquy**

The trial court conducted three colloquies with Petitioner concerning the waiver of a jury for the sentencing hearing.  The first colloquy occurred on September 24, 1997, five days before the guilt phase of the trial began.

THE COURT:          Do you understand whether you go with a jury trial or whether you go with a non-jury trial if you are found guilty of the criminal homicide charge, then because of the notice with regard to the aggravating circumstances, then there would be a second phase to the trial?  And in the second phase of the trial, the Commonwealth would then seek to prove an aggravating circumstance or circumstances, and if they were able to prove an aggravating circumstance or circumstances that would then make you eligible for the death penalty.  Do you understand that?

THE DEFENDANT:  Yes.

66

THE COURT:          And in that phase of the trial you would have the opportunity to prove mitigating circumstances.   And if there were any mitigating circumstances that were offered, then the fact finder, be it either the jury or the trial judge sitting alone, would have to balance whether the aggravating circumstances outweigh the mitigating circumstances before the death penalty could be imposed?

THE DEFENDANT: Yes.

THE COURT:          Do you understand, obviously, the difference between a non-jury and a jury trial, again, as similar to the guilt phase of the trial, that the Commonwealth need only convince one person of the existence of the aggravating circumstance or that the aggravating circumstances outweigh the mitigating circumstances, as opposed to having to convince twelve jurors unanimously of those facts?

THE DEFENDANT: Yes.

THE COURT:          Just so we're clear, you understand that the penalties that are available if you are found guilty of the criminal homicide, obviously, if it went to the second phase and there was an aggravating circumstance or circumstances that were proven, and if there were mitigating circumstances, and those aggravating circumstances outweighed the mitigating circumstances, that you face the possible imposition of the death penalty?

THE DEFENDANT: Yes.

THE COURT:          You understand if you were found guilty and there were not sufficient aggravating circumstances, or the finder of fact decided, either myself sitting at a non-jury trial or a jury, that the mitigating circumstances outweighed the aggravating circumstances, or that there were not aggravating circumstances, that then you would be subject to life without parole?

THE DEFENDANT: Yes.

(N.T. 09/24/97 at 13–15.)  Five days later, on September 29, 1997, right before the trial began, the trial court revisited the jury waiver issue as it related to the sentencing phase.

THE COURT:          And do you understand that if you are convicted of murder in the first degree, and if there is an aggravating circumstance proven, and the two that are alleged here, either a finding of torture or a finding that the killing was committed in the perpetration of a felony, and here rape, then I would decide in the same manner as a jury if you should be sentenced to life in prison without parole or a death penalty imposed; do you understand that?

THE DEFENDANT: Yes.

THE COURT:          Do you understand if you are convicted of murder in the first degree that you stand the same chance of being sentenced to life in prison or death in a trial before me as you would in a trial by jury?

THE DEFENDANT: Yes.

THE COURT:          And has anyone promised or told you that you are less likely to receive a death sentence by having the case tried before me as a bench trial than a jury trial?

THE DEFENDANT: No.

(N.T. 09/29/97 at 11–12.)

The third and last colloquy regarding the waiver of a jury for the penalty phase was then

conducted after the trial court rendered its verdict and right before the penalty phase began.

THE COURT:          Mr. Miller, the Wednesday before the start of this trial, and again immediately before the start of this trial, we discussed with you and went through the colloquy with regard to your right to a jury trial. And, obviously, you have the right to a jury trial in connection with the guilt phase of the trial. And you still also have the right to a jury trial with regard to the sentencing phase.

Obviously, with a conviction of first degree murder, the two choices for sentencing in that matter are life in prison and the death sentence. And when we reviewed that waiver of your jury trial, did you understand you were also waiving your right to a jury trial in connection with this phase of the proceeding, that is the sentencing phase?

THE DEFENDANT: Yes.

| | |
|---|---|
| THE COURT: | Just out of an abundance of caution, I ask you again, has anyone promised you anything in order to get you to do that? |
| THE DEFENDANT: | No. |
| THE COURT: | And you understand, as I think I told you at the outset of the trial itself, that you stand the same chance of being sentenced to death or sentenced to life in prison in front of me as you do in front of a jury, as far as I'll decide the matter exactly the same way that a jury will, and that is in accordance with the law as I find the law to be and the facts as I determine them to be? |
| THE DEFENDANT: | Yes. |
| THE COURT: | And I can state for both sides' benefit, I start this hearing without any preconceived notion of how it's going to end up. And I just wanted to reaffirm that you are waiving your right to a jury trial with regard to the sentencing phase, which I believe you previously waived, but I just want to make sure you haven't changed your mind. |
| THE DEFENDANT: | No. |

(N.T. 10/02/97 at 285–86.)

### b.    Constitutionally Deficient Waiver of a Penalty Phase Jury Claim

Petitioner presented the defective colloquy issue on PCRA appeal based on the fact that the colloquies failed to include critical information about the role of a jury during a capital sentencing. Petitioner also alleged that his counsel was ineffective for failing to object to the inadequate waiver and for failing to raise this issue on appeal. While the Pennsylvania Supreme Court addressed and rejected the ineffectiveness claim, it did not reach the merits of the due process claim. The court declined to address the claim on procedural grounds because "[n]o objection was made as to the inadequacy of the colloquies at any time nor was the issue raised on [direct] appeal." Miller II, 987 A.2d at 661. However, as noted in my discussion of exhaustion

69

and procedural default issues, because the waiver rule as applied to capital cases was not firmly established and regularly followed at the time of the trial and direct appeal, this is not an adequate ground to prevent federal review over this claim.  As such, I will review the due process claim de novo.  Appel, 250 F.3d 203, 210 (3d Cir. 2001).

Section 9711(b) of Pennsylvania's death penalty statute governs a capital defendant's waiver of a jury at sentencing, and provides that

> If the defendant has waived a jury trial or pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose unless waived by the defendant with the consent of the Commonwealth, in which case the trial judge shall hear the evidence and determine the penalty . . .

42 Pa. C.S. § 9711(b).  In other words, "[u]nder Pennsylvania law, a capital defendant tried without a jury in the guilt phase retains the right to a jury in the penalty phase of the trial unless he specifically waives that right without objection by the Commonwealth."  Commonwealth v. Fears, 836 A.2d 53, 70 (Pa. 2003) (citing 42 Pa.C.S. § 9711(b)).  Pennsylvania law requires that the waiver be guided by the following principles:

> Before a voluntary waiver may be accepted as knowing and intelligent, the on-record colloquy must show that the defendant fully comprehended the significance of the right being waived and must indicate that, at a minimum, the defendant knew the essential protections inherent in a jury trial as well as the consequences attendant upon a relinquishment of those safeguards.

Id. (quoting Commonwealth v. O'Donnell, 740 A.2d 198, 212 (Pa. 1999)).

Petitioner contends that the penalty phase jury waiver colloquy was deficient because it failed to inform him of the unique procedures of capital jury sentencing.  He points out that the trial court did not explain "the requirement under 42 Pa. C.S. § 9711(c)(1)(iii) that, when a jury is the finder-of-fact at a capital sentencing proceeding, the Commonwealth has the burden of proving each and every aggravator *beyond a reasonable doubt*, while the defense need only prove the existence of a mitigator by *a preponderance of the evidence*."  He further argues that

70

the trial court failed to explain that "unanimity is required for the finding of an aggravator . . . that the entire jury must consider and weigh a mitigator, even if found by only one of the jurors," and that, "in accordance with § 9711(c)(1)(v), [] the court *shall* sentence him to life imprisonment if it decides that further deliberations will not result in a unanimous verdict."

Petitioner contends that the trial judge not only failed to explain that "a single juror failing to vote for death would result in a life sentence, not a hung jury," but that "the colloquies actually suggested the opposite conclusion because the court explained that Petitioner would be tried all over again if the jury could not reach a unanimous verdict at trial, yet failed to point out that this was not true for the penalty phase." In light of this, Petitioner contends that the judge's statement that "you stand the same chance of being sentenced to death or sentenced to life in prison in front of me as you do in front of a jury, as far as I'll decide the matter in exactly the same way that a jury will," was "misleading and incorrect." (Br. at 91–92.)

After careful review of the colloquies, I agree with Petitioner that the trial judge both failed to inform and misinformed Petitioner of the unique procedures of jury sentencing. The trial judge did not explain that while the entire jury must unanimously find an aggravating factor, the entire jury would be required to consider and weigh a mitigating factor even if found by only one member of the jury. The judge did not explain the crucial difference between a trial jury and a sentencing jury, in that a hung sentencing jury would automatically result in a life sentence as opposed to a new sentencing proceeding. The trial judge's declaration that Petitioner was as likely to be sentenced to death by a judge as by a jury – which requires that twelve individuals as opposed to one conclude that a death sentence is appropriate – was also misleading. I therefore conclude that Petitioner's waiver of a penalty phase jury was not knowing and voluntary under Pennsylvania law.

However, "[not] every error of state law affecting the outcome of a state criminal proceeding [is] cognizable as a due process claim."  Johnson v. Rosemeyer, 117 F.3d 104, 112 (3d Cir. 1997).  In order for Petitioner to prove a violation of his federal due process rights, he must show not only that he was prejudiced by the violation of state law, but that he was "prejudiced in a very particular way."  Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997) (internal quotations omitted).  In Smith, the Third Circuit found that the defendant was prejudiced in such a way that violated his federal due process rights because a jury instruction, which "erroneously informed the jury that Smith could be convicted of first-degree murder even if he did not have the specific intent to kill[,] . . . operated to lift the burden of proof of an essential element of an offense as defined by state law."  Id. at 409, 416.

The Third Circuit has applied the Smith prejudice standard to a habeas claim such as this which challenges the propriety of the waiver of a penalty phase jury.  In Taylor v. Horn, 504 F.3d 416 (3d Cir. 2007), the petitioner pled guilty to five counts of first degree murder and then waived his right to a penalty phase jury.  At sentencing, Taylor prohibited his counsel from presenting mitigating evidence, and the judge sentenced him to death.  In his habeas petition, Taylor argued that the waiver of his penalty phase jury right was not knowing and voluntary under Pennsylvania law, and was furthermore a federal due process violation.  The Third Circuit rejected Taylor's claim, concluding that even if the jury waiver violated state law, Taylor could not establish that he was "prejudiced in a way that implicated his federal constitutional rights." Id. at 450.  The court explained that "[c]ritically, Taylor does not argue that having a judge determine his sentence prejudiced him any way that implicates his federal rights.  Indeed, there were substantial strategic reasons not to elect a penalty-phase jury in this case, and Taylor has never asserted that he would have elected one, had he known of the option . . . .  Accordingly, we

cannot hold on this record that the alleged state law error violated the Due Process Clause of the federal Constitution."  Id.

This case is distinguishable from Taylor in two crucial aspects.  First, Petitioner presented mitigation evidence at the sentencing hearing, and actively sought a life sentence as opposed to a death sentence.  He presented evidence that he was impaired at the time of the murder, that he was a loving father who worked hard to support his family, and that a death sentence would harm his two children.  While the trial judge did not find a catch-all mitigating circumstance under Section 9711(e)(8), he did find that the Section 9711(e)(3) mitigating factor was met, i.e., that "the capacity of the defendant to conform his conduct to the requirements of law was substantially impaired."

Second, Petitioner argues extensively that there were strategic reasons for him to prefer a jury sentencing over bench sentencing, and that having a judge determine his sentence prejudiced him.  These arguments are closely related to Petitioner's arguments that the penalty phase jury waiver colloquy was deficient under state law, and are summed up by Petitioner's contention that "it is highly likely that the Commonwealth would not have been able to persuade all twelve jurors to vote for death."  (Br. at 93.)

While I do not and need not weigh in on whether a jury would not have reached a unanimous death sentence, I do accept Petitioner's position that it is more likely that one of twelve jurors (as opposed to one judge) could have found that the evidence constituted a catch-all mitigating circumstance under Section 9711(e)(8) or that the Section 9711(e)(3) mitigator outweighed the aggravating factor.  This stands in stark contrast to Taylor, where no mitigation evidence was presented.  Accordingly, I conclude that Petitioner was prejudiced by the deficient penalty phase jury waiver colloquy in a way so as to violate his federal right to due process.  I

will therefore grant relief on this claim, for which a new sentencing hearing is the proper remedy.[11]

### 7.   Claim VII: Was the Prosecutor-Introduced Inadmissible Victim Impact Evidence in Violation of Petitioner's Constitutional Rights, and Was Petitioner's Counsel Ineffective for Failing to Raise and Litigate This Claim?

Petitioner next argues that the prosecutor committed misconduct by introducing inadmissible victim impact evidence during the penalty phase of the hearing.  Petitioner posits that this misconduct violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights to a fair sentencing proceeding in that the trial judge, sitting as factfinder, considered nonstatutory aggravating factors in sentencing him to death.  Petitioner points specifically to the testimony of his daughter, Barbara Miller, who held up a picture of her deceased mother and testified how her life had deteriorated since her death, and to certain comments that the prosecutor made after Barbara testified that urged the court to consider the effect of Petitioner's crime on the victim's family.  Petitioner relatedly contends that counsel was constitutionally ineffective for failing to object to this evidence and raise this issue on appeal.  (Br. at 100–01.)

### a.   The Introduction of the Victim Impact Evidence

The prosecutor began the penalty phase hearing by stating that "the Commonwealth has two purposes in presenting the matter for sentencing pursuant to the death penalty.  The first is that we wish to present evidence regarding both of the aggravating circumstances . . . . [and the second is] information concerning the impact the death of the victim has had on the family of the victim."  With respect to this second purpose, the prosecutor continued that "at Section 9711 (a) (2) of the Sentencing Code the rules indicate that evidence shall include information concerning

---

[11] Having granted relief on the due process claim, I need not discuss the related claim that counsel was ineffective for having failed to object to the waiver colloquy and for failing to raise that issue on appeal.

the victim and the impact the death of the victim has had on the family of the victim." The

prosecutor then called Barbara Miller, the daughter of Petitioner and the victim, who was 13 at

the time, to testify about the impact her mother's death had on her. (N.T. 10/02/97 at 285–89.)

Barbara Miller testified as follows:

> PROSECUTOR: Barbara, I notice that you have with you a photograph. Would you like to show that to the judge?
>
> BARBARA: (Witness complies.)
>
> PROSECUTOR: Barbara, who is in that photograph?
>
> BARBARA: My mom and me.
>
> . . .
>
> PROSECUTOR: Now that your mother is gone, can you tell us how that has affected you and how that affects your life and your brother's life?
>
> BARBARA: Well, I'm going to have to grow up without a mom. And my brother, it's going to be hard for him to understand, because he never knew her. So he'll never get to know her. Like I always thought my mom would be there for me and she can't be now. And it's just like in school I kind of went downhill, but I think I'm getting better now. It's just really hard because I think about her every day.
>
> PROSECUTOR: How many different people have you lived with since your mother's death?
>
> BARBARA: This will be the fourth move.
>
> PROSECUTOR: And, in fact, is the question of your ultimate custody still up in the air?
>
> BARBARA: Yes.

(Id. at 289–90.)

After Barbara Miller testified, the prosecutor addressed the court, stating:

I've spoken with other members of the family, and I think most of them have indicated it would be too emotional for them to get up and address the Court at this time.  I think there really doesn't need to be much elaboration by the Commonwealth to your Honor about how this has affected a number of people.  You've seen the people come to court.  You've heard the reactions during the testimony and during the trial.  And I think I speak for all of them when I say it has had a tremendous and terrible impact on this family.  And we hope that Your Honor will take that into consideration in forming your sentence in this matter.  And that's all we would present at this time.

(Id. at 291.)

### b. Counsel's Performance Was Deficient for Failing to Object to the Introduction of the Victim Impact Evidence

Respondents do not dispute that trial counsel's performance was deficient for having failed to object to the presentation of the photograph, the testimony of Barbara Miller, and the prosecutor's remarks about the emotional effect of the death on the victim's family.  This is because while 42 Pa. C.S.A. § 9711(a)(2) provides that "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible" at the penalty phase hearing, that amendment to the statute did not take effect until December 10, 1995. See Commonwealth v. McNeil, 679 A.2d 1253, 1259 (Pa. 1996) (stating that the amendment to 42 Pa. C.S.A. § 9711(a)(2) which made victim impact testimony admissible "shall only apply to sentences imposed for offenses which take place on or after the [December 10, 1995] effective date of the Act").  Because the murder occurred on November 19, 1995, the victim impact testimony presented at the sentencing hearing was *per se* inadmissible under Pennsylvania law. Id.  The Pennsylvania Supreme Court recognized that this was the case in its PCRA appeal opinion, and I agree that counsel's performance was deficient for having failed to object to the introduction of the victim impact evidence.  Miller II, 987 A.2d at 669; see also Everett v. Beard, 290 F.3d 500, 513 (3d Cir. 2002) (explaining that "[a] reasonably competent attorney patently is required to know the state of the applicable law").

76

### c.   Petitioner Was Not Prejudiced by the Introduction of the Victim Impact Evidence

Petitioner argues that he was prejudiced by counsel's failure to object to the introduction of the victim impact evidence because the trial court was able to hear and consider emotionally powerful nonstatutory aggravating factors in imposing the death penalty.[12]   The Pennsylvania Supreme Court dismissed this claim on the following basis:

> No relief is due on this claim because Appellant failed to meet his burden of proving that trial counsels failure to object to the prosecutors actions prejudiced him. First, the actions and comments of the prosecutor were innocuous insofar as they were fleeting and did not dwell on the victim. In numerous cases, this Court has refused to find prejudice under similar circumstances. See Commonwealth v. Freeman, [] 827 A.2d 385, 414 (2003) (holding that brief victim impact testimony indicating that victim was "peaceful" and "nice" was not prejudicial); see also Commonwealth v. Rollins, [] 738 A.2d 435, 447 (1999) (same).
>
> Appellant cannot prove prejudice for a second reason. The PCRA court, sitting as factfinder, indicated that it was not influenced by the victim's photograph or the prosecutor's comments and that neither the photograph nor the comments had any effect on the verdict it ultimately rendered. PCRA Court Opinion, 6/30/07, 37–38. It is presumed that a trial court, sitting as factfinder, can and will disregard prejudicial evidence. See Commonwealth v. Davis, [] 421 A.2d 179, 183 (1980); Commonwealth v. David Brown, 886 A.2d 256 (Pa.Super.2005). Thus, because Appellant has failed to prove that the outcome of the proceedings would have been different had trial counsel lodged an objection, he is not entitled to relief with respect to this claim. [FN22]
>
> FN22:  We note that a review of the prosecutor's closing argument during the penalty phase indicates that the prosecutor did not comment upon the evidence he presented during the penalty hearing.  N.T. 10/2/97, 325–29.

---

[12]  As noted previously in my discussion of the exhaustion issues related to this claim, the Pennsylvania Supreme Court, while it reached the merits of the ineffectiveness claim, did not address the underlying claim that the prosecutor committed misconduct for having introduced the victim impact evidence.  Nevertheless, I concluded that the prosecutorial misconduct claim was properly exhausted since the court effectively resolved the issue through its analysis of the prejudice prong of the ineffective assistance claim.  Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001) (explaining that, where considering a prosecutorial misconduct claim, a court must consider the extent to which the prosecution's conduct prejudiced Petitioner).  I will therefore consider the prosecutorial misconduct claim here as I consider the prejudice prong of the ineffectiveness claim.

Miller II, 987 A.2d at 669–70.

Petitioner contends that the Supreme Court's conclusion here was both an unreasonable determination of the facts and an unreasonable application of Strickland.  With respect to the factual determination, Petitioner takes issue with the court's characterization of the prosecutor's actions and comments as "innocuous."  I do not find this to be an unreasonable factual determination.  Rather, the court's characterization of these comments as "innocuous insofar as they were fleeting and did not dwell on the victim" was accurate. The comments were indeed brief, and the prosecutor, who stated simply that the family was "emotional" and that the murder had a "terrible impact," spoke in general and obvious terms about how the victim's death had affected the family.  Further, the prosecutor did not dwell upon these comments or any of the other victim impact evidence during his closing argument at the penalty phase.  (N.T. 10/29/03 at 325–29.)

As for the state court's legal determination, Petitioner argues that the assessment of the prejudice prong of Strickland was unreasonable in that it focused on whether the judge actually and subjectively relied upon the victim impact testimony in sentencing Petitioner to death. Instead, Petitioner asserts that the proper Strickland analysis is whether the admission of the victim impact testimony would have affected the determination reached by an objectively reasonable factfinder.   See Strickland, 466 U.S. at 695 ("The assessment of prejudice . . . should not depend on the idiosyncracies [sic] of the particular decisionmaker.").

While I agree with Petitioner that the court's emphasis on the PCRA court's declaration that the victim impact evidence did not actually have an effect on the death sentence ultimately rendered was misplaced, it was not unreasonable.  Rather, it was entirely relevant to the court's finding that Petitioner was not prejudiced since he had failed to put forth any evidence to rebut

the objective presumption "that a trial court, sitting as factfinder, can and will disregard prejudicial evidence." Miller II, 987 A.2d at 669–70 (citing state law); see also Harris v. Rivera, 454 U.S. 339, 346–47 (1981) (observing that a judge, sitting as a factfinder, routinely hears inadmissible information, and that it is presumed, under federal law, that the judge will ignore such information when making decisions).  In this regard, Strickland instructs that a habeas court "should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."  466 U.S. at 695.  Applying these presumptions here, I presume that the trial judge acted reasonably and did not rely on inadmissible victim impact testimony in sentencing Petitioner to death.

Petitioner has presented no evidence to rebut this presumption.  In imposing the death sentence, the judge stated that the only aggravating circumstance was that "the defendant committed a killing while in the perpetration of a felony," and he did not make any reference to the victim impact testimony.  (N.T. 10/23/97 at 341.)  As such, Petitioner's assertion that he was prejudiced by the inadmissible victim impact testimony and that the prosecutor committed misconduct by presenting such evidence is unsupported by the record.  He is due no relief on this claim.

### 8.    Claim VIII: Were Petitioner's Waiver of a Jury Trial and Waiver of His Right to Testify in His Own Defense at the Guilt Phase Invalid Because They Were the Product of the Ineffective Assistance of Counsel?

Petitioner next claims that defense counsel's failure to investigate, develop, and present defenses to first degree murder made his waiver of the right to a jury trial and waiver of his right to testify in his own defense invalid because counsel's advice was the product of ineffective

assistance of counsel.[13]  Petitioner incorporates the ineffectiveness arguments he made in Claims I-IV, where he alleged that trial counsel failed to investigate and present evidence to support the heat of passion defense, to rebut the allegation of rape, and to discredit prosecution witness Michael Torres.  Petitioner argues that counsel's unreasonable advice prejudiced him since "[i]t is reasonably probable that a jury, after hearing details of the stormy relationship between petitioner and the decedent, would have had a reasonable doubt that this was first degree murder."  (Br. at 109–12.)

There is little precedential guidance regarding allegations of ineffectiveness relating to the waiver of a jury trial.  Other circuits have observed that "[a]n attorney's decision to waive his client's right to a jury is a classic example of a strategic trial judgment, 'the type of act for which Strickland requires that judicial scrutiny be highly deferential.'"  Hatch v. State of Oklahoma, 58 F.3d 1447, 1459 (10th Cir. 1995) (quoting Green v. Lynaugh, 868 F.2d 176, 178 (5th Cir. 1989)).  While "[m]ost claims of ineffective assistance relate to alleged negligent omissions by attorneys," the decision of whether or not to waive a jury trial is merely a "choice between alternatives, a tactical judgment [which] will almost never be overturned on habeas corpus."  Carter v. Holt, 817 F.2d 699, 701 (11th Cir. 1987).  In this regard, "[f]or counsel's advice to rise to the level of constitutional ineffectiveness, the decision to waive a jury trial must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.'"  Hatch, 58 F.3d at 1459 (quoting United States v. Ortiz Oliveras, 717 F.2d 1, 3 (1st Cir. 1983)).

At the PCRA hearing, trial counsel was asked about the advice he gave Petitioner with respect to waiving a jury trial.  Counsel stated that, after having considered the "entire

---

[13] Petitioner does not allege that the waivers themselves were substantively and constitutionally defective.  As such, I need not discuss the content of the waivers here.

circumstances and the information surrounding [the case]," he advised Petitioner that he would be better served by a bench as opposed to a jury trial since "[he] thought that the circumstances were [such]  that a jury would have given [Petitioner] the death penalty."[14]  (N.T. 10/27/03 at 53–56.)

On PCRA appeal, the Pennsylvania Supreme Court considered whether Petitioner's waiver of a jury trial was defective on account of counsel's ineffectiveness.   As for the deficient performance prong of Strickland, the court concluded that "[a]ppellant is entitled to no relief with respect to this issue because we have [already] held that trial counsel was not ineffective for the reasons stated."  Miller II, 987 A.2d at 660.  Petitioner argues that because the court's application of Strickland was unreasonable throughout its opinion it was also unreasonable here.

I acknowledge that my conclusion with respect to the question of whether counsel was ineffective in rebutting the allegation of rape differs from that of the Pennsylvania Supreme Court, and that could bear on my analysis here.  Nonetheless, I find the court's conclusion that counsel's advice to waive a jury trial was effective to be reasonable. This is because, as I have explained throughout this opinion including in my discussion of the heat of passion defense, I agree with the state court that the evidence supporting the premeditation and specific intent to sustain a first degree murder conviction – the note left at the scene, the stab wounds, the lack of information as to what occurred immediately before the murder – was strong and convincing.  As such, counsel's advice that Petitioner should waive a jury trial, which was based on his belief

---

[14] In Pennsylvania, once a capital defendant is found guilty of first degree murder by a jury, he does not have the opportunity to then waive a jury for the penalty phase.  See 42 Pa. C.S. § 9711(a)(1) ("After a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment.") (emphasis added).  As such, I take counsel's comments to also mean that he believed that a jury would be more likely than a judge to convict him of first degree murder.

that a jury would be more likely than a judge to convict, was well within the bounds of reasonable professional judgment, and this claim fails.  Hatch, 58 F.3d at 1459.

Petitioner's next and related claim is that his waiver of the right to testify at trial was invalid on account of counsel's ineffectiveness.  In addressing this claim, the Pennsylvania Supreme Court explained that "[c]laims alleging ineffectiveness of counsel premised on allegations that trial counsel's actions interfered with an accused's right to testify require a defendant to prove that 'counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf.'"  Miller II, 987 A.2d at 660 (quoting Commonwealth v. Nieves, 746 A.2d 1102, 1104 (2000)) (citing Commonwealth v. Uderra, 706 A.2d 334 (1998)).  The court then rejected the claim as "meritless," noting that while "trial counsel testified at the evidentiary hearing that he asked Appellant to testify both at trial and during the penalty hearing," Petitioner did not testify at the PCRA hearing, which "has placed this Court in the position of having to guess whether counsel's ineffectiveness interfered with his right to testify."  Id. at 661.

Petitioner is due no relief on this claim.  In the absence of Petitioner's testimony, it was indeed reasonable for the state court to conclude that counsel's advice or actions did not undermine his waiver of his right to testify.  Furthermore, a petitioner cannot show that he was prejudiced within the meaning of Strickland by his failure to testify without informing a court of the facts to which he would have testified at trial.   See Palmer v. Hendricks, 592 F.3d 386, 394 (3d Cir. 2010) (rejecting a claim that the defense attorney was ineffective for interfering with his right to testify where the petitioner did not inform the court of any of the facts to which he would have testified, but merely stated that he wanted to "explain [his] side").  In his habeas petition, and without further detail, Petitioner contends simply that he would have described the "stormy

relationship" between himself and the victim.  (Br. at 109.)  Accordingly, this claim fails on the prejudice prong of Strickland as being insufficiently pled.

> **9.      Claim IX: Does the Cumulative Effect of the Errors in This Case Entitle Petitioner to Habeas Relief?**

Lastly, Petitioner contends that he is entitled to relief from his convictions and sentence because the cumulative effect of the errors in this case "render[ed] the verdict in this case inherently unreliable" thereby violating his constitutional right to due process. (Br. at 114–17.) The Third Circuit has held that "[i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermine the fundamental fairness of his trial and denied him his constitutional right to due process." Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008).  Cumulative errors will be deemed harmful only where "they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice."  Id. (internal quotation marks omitted).  To satisfy this standard, a petitioner must show that the errors complained of "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  Murray v. Carrier, 477 U.S. 478, 494 (1986).  In this regard, the Third Circuit "read[s] United States Supreme Court precedent as establishing the principle that the stronger the evidence against the defendant, the more likely that improper arguments or conduct have not rendered the trial unfair."  Marshall v. Hendricks, 307 F.3d 36, 69 (3d Cir. 2002).

Petitioner brings this allegation of cumulative error as a direct claim, as opposed to an attack on the Pennsylvania Supreme Court's factual and legal determination.[15]   The

_____

[15] While Respondents do not take issue with this approach, they argue that I should reject this claim on the basis that it is "a boilerplate, bald assertion, essentially consisting of a few bullet

Pennsylvania Supreme Court did, however, address this claim on PCRA appeal, citing only to Pennsylvania precedent and denying relief on the grounds that "[t]his Court has repeatedly stated that 'no number of failed claims may collectively warrant relief if they fail to do so individually.'"   Miller II, 987 A.2d at 672 (citing to Commonwealth v. Washington, 927 A.2d 586, 617 (Pa. 2007); Commonwealth v. Tedford, 960 A.2d 1, 56 (Pa. 2008)).   In this regard, there is a disparity between Pennsylvania precedent and the federal standard of constitutional error regarding claims of cumulative prejudice, as federal law permits a claim of cumulative prejudice even where the individual claims fail.   See, e.g., Fahy, 516 F.3d at 205.   Accordingly, since the Pennsylvania Supreme Court did not examine this claim "in light of federal law as established by the Supreme Court of the United States . . . the pre-AEDPA standards of review apply."   Everett v. Beard, 290 F.3d 500, 508 (3d Cir. 2002).   Under those standards, I "owe[] no dereference to [the] state court's resolution of mixed questions of constitutional law and fact, whereas the state court's factual findings are presumed to be correct unless [] the state court's findings are not fairly supported by the record."   Id. (citations and quotations omitted).

Petitioner is due no relief on this claim of cumulative error as it relates to his conviction for first degree murder.   As noted throughout this opinion, the evidence presented during the guilt phase of trial, particularly of the stab wounds and the incriminating note left at the scene, strongly supports the finding that Petitioner acted with the malice and specific intent necessary to support a first degree murder conviction.   See Marshall, 307 F.3d at 69 ("[T]he stronger the evidence against the defendant, the more likely that improper arguments or conduct have not rendered the trial unfair.").

---

points in his memorandum."  (Resp. at 72.)  While this claim is not as thoroughly developed as his other claims, Petitioner has set forth the legal standard which applies to a cumulative prejudice claim, and, through footnotes, has incorporated his discussion of the other eight claims into this claim.  This is sufficient.

With respect to Petitioner's conviction for rape and the death sentence, I will grant habeas relief based on trial counsel's failure to adequately investigate, prepare, and present testimony to rebut the Commonwealth's allegations that the victim was raped during the commission of the homicide, and will separately grant Petitioner relief from his death sentence on account of the constitutionally deficient penalty phase jury waiver colloquy.  (See Claims II and VI.)  I conclude that Petitioner is not entitled to relief on his other penalty phase claims. (See Claims III, V, and VII.)  Because I have granted Petitioner relief from the rape conviction and death sentence on individual claims – and the claims which I denied taken together did not render his sentencing proceeding any more unfair – Petitioner's claim of cumulative prejudice is denied.

## IV.    CONCLUSION

For the reasons stated herein, Petitioner is granted habeas relief from his rape conviction and death sentence based on trial counsel's failure to adequately investigate, prepare, and present testimony to rebut the Commonwealth's allegations that the victim was raped during the commission of the homicide (Claim II).  Petitioner is also granted habeas relief from his death sentence on account of the constitutionally deficient penalty phase jury waiver colloquy (Claim VI).  Petitioner is due no relief on the guilt phase claims as they relate to his first degree murder conviction.

An appropriate Order follows.